# CASE NO. 24-12436-G

## UNITED STATES COURT OF APPEALS, ELEVENTH CIRCUIT

DAVID COLLIER

Appellant/Defendant,

v.

KIMBERLY DIANE SETTLE,
as Personal Representative for the Estate of Jacob Settle,

Appellee/Plaintiff .

On Appeal from the United States District Court
for the Northern District of Florida
Pensacola Division
The Honorable T. Kent Wetherell, III
District Court Case No.: 3:22-cv-22688

## Brief of Appellant/Defendant David Collier

Alyssa M. Yarbrough
Florida Bar No. 103407
Timothy M. Warner
Florida Bar No. 0642363
Jennifer Hawkins
Florida Bar No. 017694
WARNER LAW FIRM, P.A.
501 W. 11th Street, Suite A
Panama City, Florida 32401
850-784-7772
pleadings@warnerlaw.us

**CERTIFICATE OF INTERESTED PERSONS AND CORPORATE
DISCLOSURE STATEMENT OF
APPELLANT/DEFENDANT DAVID COLLIER**

**Case No.: 24-12436-G**
***David Collier v. Kimberly Diane Settle***

The persons and entities known to Appellant David Collier  as interested in the outcome of this matter are as follows:

1.    Cannon, Hope T., *U.S. District Magistrate Judge.*

2.    Collier, David, *Defendant/Appellant.*

3.    Emmanuel, Sheppard & Condon, *Counsel for Plaintiff/Appellee, Kimberly Diane Settle.*

4.    Escambia County Sheriff's Office, *Government Agency/Law Enforcement Agency.*

5.    Florida Sheriff's Risk Management Fund, *insurer for Defendant/Appellant.*

6.    Hart, Raymond, *former Defendant.*

7.    Hawkins, Jennifer, *Counsel for Defendant/Appellant, David Collier.*

8.    Novotny, Galen M., *Counsel for Plaintiff/Appellee, Kimberly Diane Settle.*

9.    Settle, Kimberly Diana, *Plaintiff/Appellee.*

10.    Simmons, Chip, Sheriff of Escambia County, *former Defendant.*

11.    Stevenson, Eric, *Counsel for Plaintiff/Appellee, Kimberly Diane Settle.*

12.    Stevenson Klotz, LLP, *Counsel for Plaintiff/Appellee, Kimberly Diane Settle.*

**Case No.:  24-12436-G**
*David Collier v. Kimberly Diane Settle*

13.    Warner Law Firm, P.A., *Counsel for Defendant/Appellant, David Collier.*

14.    Wetherell, T. Kent II, *U.S. District Court Judge.*

<u>Corporate Disclosure Statement</u>

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1-1 through 26.1-5, no publicly traded company or corporation has an interest in the outcome of the case or the appeal.

## <u>Statement Regarding Oral Argument</u>

This case arises from two deputies' attempt to execute valid arrest warrants on two individuals on the night of November 14, 2020. Appellee Kimberly Diane Settle, as Personal Representative of the estate of Jacob Joseph Settle, Sr., brought a lawsuit asserting claims against the Sheriff, Deputy Raymond Hart, and Appellant Collier; only 42 U.S.C. §1983 and state law battery claims survived against Appellant Collier.

While there are Eleventh Circuit cases addressing the use of deadly force when an individual is in a vehicle, none of those cases are factually similar to this case. In this case, it was dark, and after receiving no response when Collier and Hart knocked on the front door of Settle's residence, they made their way to the backyard, where they located a truck, which was parked facing the house and adjacent to an enclosed porch. The area around the house where the truck was parked was confined and littered with debris and obstacles, making it difficult to navigate. Collier and Hart used their flashlights as they approached the truck. Collier approached the driver's side and Hart approached the passenger's side. They located Settle and Sophronia Whitehead attempting to conceal themselves in the truck. Collier attempted to open the driver's side door, but it was locked. Collier then attempted to break the window, but Settle grabbed his keys from the center console, put the keys into the ignition, started the engine, and put the truck into gear. When Settle started

i

the engine, it made a loud noise that startled Collier. While attempting to get away from the truck, Collier tripped over debris in the yard and fell. Once Collier got to his feet, afraid that Settle would run over him and worried for Hart's safety, he fired two shots into the driver's side window, striking Settle. Settle ultimately succumbed to his injuries.

Respectfully, the District Court erred when it found that Collier was not entitled to qualified immunity despite the facts and tense and rapidly evolving situation Collier faced. The District Court, in denying Collier qualified immunity, did not cite alternative authority that "squarely governs the case here." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (citing *Brosseau v. Haugen*, 543 U.S. 194, 201 (2004). The facts of this case and the District Court's ruling pose the following questions: (1) in such tense and rapidly evolving circumstances, is deadly force justifiable and (2) in such tense and rapidly evolving circumstances, is an officer entitled to qualified immunity?

Collier contends that the issues before this Court have not been authoritatively decided and will be significantly aided by oral argument. Therefore, Appellant Collier respectfully requests oral argument to dispose of this appeal pursuant to Rule 34, Fed. App. Civ. P. and Eleventh Circuit Rule 34-3, as it would aid in the resolution of this matter.

ii

## <u>TABLE OF CONTENTS</u>

Appellants/ Defendants' Certificate of Interested Persons and
Corporate Disclosure Statement ..............................................................C1

Statement Regarding Oral Argument ....................................................... i

Table of Contents .................................................................................... iii

Table of Citations.................................................................................... v

Statement of Subject Matter and Appellate Jurisdiction ...........................1

Statement of the Issues...............................................................................1

    I.     Whether Defendant/Appellant Daivd Collier is entitled to qualified Immunity.

    II.    Whether the Defendant/Appellant David Collier violated Jacob Joseph Settle, Sr.'s constitutional rights.

    III.   Whether the Defendant/Appellant David Collier is entitled to state-agent immunity.

Statement of the Case.................................................................................2

    I.     Course of Proceedings and Disposition in the District Court ...............2

    II.    Statement of the Facts............................................................................3

        A.   Deputies' arrival at the residence and their knowledge of Settle.............................................................................................3

        B.   Deputies approach Settle's residence. ..........................................5

        C.   The Deputies' approach to the truck. ...........................................6

        D.   After the Shooting. .......................................................................13

    III.    Statement of Standard of Review ........................................................14

Summary of the Argument..........................................................................16

Argument and Citations of Authority ......................................................17

I.    DEFENDANT/APPELLANT DAVID COLLIER IS ENTITLED TO
      QUALIFIED IMMUNITY.......................................................................17

      A.    Qualified Immunity Standard.....................................................17

      B.    There Was No Fourth Amendment Violation. ...........................20

      C.    There Is No Case That Would Have Put Collier on Notice. .....36

II.   DEFENDANT/APPELLANT DAVID COLLIER IS ENTITLED TO
      STATE-AGENT IMMUNITY PURSUANT TO FLORIDA STATUTE
      §768.28(9)..............................................................................................47

Conclusion …………………………………………………………… 50

Certificates of Compliance with Type-Volume Limit, Typeface Requirements,
and Type-Style Requirements...................................................................52

Certificate of Service ...............................................................................53

# TABLE OF CITATIONS

Cases                                                                    Page(s)

*Alexander v. Sheriff of Indian River County, Florida*,
  724 Fed. Appx. 744 (11th Cir. 2018) ................................................. 48
*Ashcroft v. al-Kidd*,
  563 U.S. 731 (2011) ........................................................................... 17
*Black v. Wigington*,
  811 F.3d 1259 (11th Cir. 2016) ......................................................... 25
*Bolton v. Wood*,
  682 F.Supp.3d 1304 (N.D. Ga. 2023) ............................................... 32
*Brosseau v. Haugen*,
  543 U.S. 194 (2004) ..................................................................... Passim
*Carr v. Tatangelo*,
  338 F.3d 1259 (11th Cir. 2003) .................................................... 28, 41
*City & Cnty. Of San Francisco v. Sheehan*,
  575 U.S. 600 (2015) .................................................................... 17, 18
*City of Miami v. Sanders*,
  672 So.2d 46 (Fla. 3d DCA 1996) ..................................................... 48
*Coffin v. Brandau*,
  642 F.3d 999 (11th Cir. 2011) ........................................................... 45
*Courson v. McMillian*,
  939 F.2d 1479 (11th Cir. 1991) ......................................................... 18
*Crosby v. Monroe Cnty.*,
  394 F.3d 1328 (11th Cir. 2004) ......................................................... 22
*Davidson v City of Opelika*,
  675 Fed. App'x 955 (11th Cir. 2017) ............................................ 20, 24
*Davis v. Waller*,
  44 F.4th 1305 (11th Cir. 2022) ......................................................... 41
*District of Columbia v. Wesby*,
  583 U.S. 48 (2018) ............................................................................. 25
*Durruthy v. Pastor*,
  351 F.3d 1080 (11th Cir. 2003) ......................................................... 18
*Ellis v. England*,
  432 F.3d 1321 (11th Cir. 2005) ......................................................... 14
*Garrett v. Athens-Clarke Cnty., Ga.*,
  378 F.3d 1274 (11th Cir. 2004) ......................................................... 23

*Gates v. Khokar*,
  884 F.3d 1290 (11th Cir. 2018)........................................................... 18
*Graham v. Connor*,
  490 U.S. 386 (1989) ......................................................... 20, 21, 23
*Gregory v. Miami Dade, Florida*,
  719 Fed. Appx. 859 (11th Cir. 2017)................................................. 45
*Harris-Billups v. Anderson*,
  61 F.4th 1298 (11th Cir. 2023) ......................................................... 25
*Holloman ex rel. Holloman v. Harland*,
  370 F.3d 1252 (11th Cir. 2004)......................................................... 19
*Hoyt v. Cooks*,
  672 F.3d 972 (11th Cir. 2012)........................................................... 37
*Jackson v. Sauls*,
  206 F.3d 1156 (11th Cir. 2000)......................................................... 15
*Jean-Baptiste v. Gutierrez*,
  627 F.3d 816 (11th Cir. 2010) .............................................. 23, 26, 44
*Johnson v. Jones*,
  515 U.S. 304 (1995) ............................................................... 1, 15
*Kaley v. U.S.*,
  571 U.S. 320 (2014) ....................................................................... 25
*Kesinger ex rel. Estate of Kesinger v. Herrington*,
  381 F.3d 1243 (11th Cir. 2004)......................................................... 23
*Kisela v. Hughes*,
  138 S.Ct. 1148 (2018) ............................................................ 21, 45
*Lee v. Ferraro*,
  284 F.3d 1188 (11th Cir. 2002)................................................... 18, 22
*Livernois v. Medical Disposables, Inc.*,
  837 F.2d 1018 (11th Cir. 1988)......................................................... 15
*Long v. Slaton*,
  508 F.3d 576 (11th Cir. 2007)................................................ 21, 27, 30, 32
*Malley v. Briggs*,
  475 U.S. 335 (1986) ............................................................... 17, 18
*McCormick v. City of Ft. Lauderdale*,
  333 F.3d 1234 (2003) ..................................................................... 21
*McCullough v. Antolini*,
  559 F.3d 1201 (11th Cir. 2009)................................... 20, 21, 22, 38
*McGhee v. Volusia County*,
  679 So. 2d 729 (Fla. 1996)............................................................... 48
*Menuel v. City of Atlanta*,
  25 F.3d 990 (11th Cir. 1994)............................................................ 28

*Mercado v. City of Orlando*,
   407 F.3d 1152 (11th Cir. 2005)....................................................... 37

*Merricks v. Adkisson*,
   785 F.3d 553 (11th Cir. 2015)............................................................ 1

*Mitchell v. Forsyth*,
   472 U.S. 511 (1985) ........................................................................... 1

*Morton v. Kirkwood*,
   707 F.3d 1276 (11th Cir. 2013)..................................... 15, 37, 38, 39

*Mullenix v. Luna*,
   577 U.S. 7 (2015) ....................................................................... 18, 45

*Pace v. Capobianco*,
   283 F.3d 1275 (11th Cir. 2002)....................................................... 28

*Pearson v. Callahan*,
   555 U.S. 223 (2009) ........................................................................ 19

*Penley v. Eslinger*,
   605 F.3d 843 (11th Cir. 2010)................................................... 24, 50

*Perez v. Suszczynski*,
   809 F.3d 1213 (11th Cir. 2016)....................................................... 19

*Peterson v. Pollack*,
   290 So. 3d 102 (Fla. 4th DCA 2020) .............................................. 48

*Plumhoff v. Rickard*,
   572 U.S. 765 (2014)............................................................... 1, 17, 18

*Priester v. City of Riviera Beach*,
   208 F.3d 919 (11th Cir. 2000)......................................................... 37

*Prosper v. Martin*,
   989 F.3d 1242 (11th Cir. 2021)....................................................... 37

*Richardson v. City of Pompano Beach*,
   511 So.2d 1121 (Fla. 4th DCA 1987) ............................................. 48

*Robinson v. Arrugueta*,
   415 F.3d 1252 (11th Cir. 2005)................................................. 28, 33

*Robinson v. Rankin*,
   815 Fed. Appx. 330 (11th Cir. 2020) .............................................. 38

*Salvato v. Miley*,
   790 F.3d 1286 (11th Cir. 2015)....................................................... 20

*Saucier v. Katz*,
   533 U.S. 194 (2001) ........................................................................ 19

*Scott v. Harris*,
   550 U.S. 372 (2007) ...................................................................Passim

*Sheth v. Webster*,
   145 F.3d 1231 (11th Cir. 1998)....................................................... 15

*Siegert v. Gilley*,
   500 U.S. 226 (1991) ........................................................................ 1

*Sierra v. Associated Marine Insts., Inc*.,
   850 So.2d 582 (Fla. 2d DCA 2003) ............................................. 48

*Singletary v. Vargas*,
   804 F.3d 1174 (11th Cir. 2015).............................................. 31, 32

*Smith v. Mattox*,
   127 F.3d 1416 (11th Cir. 1997).................................................. 37

*Spencer v. City of Orlando*,
   725 F. App'x 928 (11th Cir. 2018) ....................................... 29, 30, 32

*Tennessee v. Garner*,
   471 U.S. 1 (1985) ................................................................. Passim

*Terrell v. Smith*,
   668 F.3d 1244 (11th Cir. 2012).................................................. 46

*Tillis on behalf of Wuenschel v. Brown*,
   12 F.4th 1291 (11th Cir. 2021).......................................... 23, 25, 43, 44

*Troupe v. Sarasota County, Fla.*,
   419 F.3d 1160 (11th Cir. 2005).................................................. 30

*Underwood v. City of Bessemer*,
   11 F.4th 1317 (11th Cir. 2021) ................................................. 43

*Vaughan v. Cox*,
   343 F.3d 1323 (11th Cir. 2003)........................................... 21, 39, 40

*White v. Pauly*,
   580 U.S. 73 (2017) ................................................................. 18

*Williams v. Aguirre*,
   965 F.3d 1147 (11th Cir. 2020).................................................. 15

*Williams v. Deal*,
   659 F. App'x 580 (11th Cir. 2016) ............................................. 22

## **Statement of Subject-Matter and Appellate Jurisdiction**

The District Court had subject-matter jurisdiction over this 42 U.S.C. § 1983 action pursuant to 28 U.S.C. § 1331 when it denied qualified immunity to Defendant/Appellant David Collier (hereinafter, "Collier) on federal claims of excessive force, which is the basis for this appeal. The District Court's Order in this case denied Collier qualified immunity from suit and trial as well as from liability. *Siegert v. Gilley*, 500 U.S. 226, 232 (1991). See also, *Merricks v. Adkisson*, 785 F.3d 553, 558 (11th Cir. 2015) ("[Qualified immunity] is also designed … to provide a direct way to end insubstantial claims on summary judgment.").

This Court has interlocutory appellate jurisdiction over the denial of a motion for summary judgment based on qualified immunity. See *Johnson v. Jones*, 515 U.S. 304, 309 (1995); *Mitchell v. Forsyth*, 472 U.S. 511, 528 (1985); *Plumhoff v. Rickard*, 572 U.S. 765, 771-72 (2014).

## **Statement of the Issues**

I.    Whether Defendant/Appellant David Collier is Entitled to Qualified Immunity.

II.   Whether the Defendant/Appellant David Collier violated Jacob Joseph Settle, Sr.'s constitutional rights.

III.  Whether Defendant/Appellant David Collier is Entitled to State-Agent Immunity.

1

## STATEMENT OF THE CASE

### I.    Course of Proceedings and Disposition in the District Court

On November 14, 2022, Appellee/Plaintiff served Raymond Hart, David Collier, and Escambia County Sheriff Chip Simmons with a four-count Complaint in the United States District Court for the Northern District of Florida [ECF1, ECF7, ECF8, ECF9.  On December 1, 2022, the Defendants filed their respective Answers and Defenses [ECF11, ECF12, ECF13].

On August 23, 2023, Plaintiff filed her Stipulated Motion for Dismissal of Defendant Raymond Hart [ECF31] and on August 24, 2023, the Court entered an Order of Partial Dismissal, dismissing all claims against Defendant Raymond Hart, with prejudice [ECF32],

On March 21, 2024, the parties filed their Joint Stipulated Motion for Dismissal with Prejudice of Defendant Chip Simmons, in his official capacity as Sheriff of Escambia County, Only. [ECF43] On March 22, 2024, the Court entered an Order of Partial Dismissal, dismissing all claims against Defendant Simmons, in his official capacity, with prejudice [ECF44].

Thereafter, the only remaining claims were Count I, Civil Rights Claim under 42 U.S.C. §1983 – Excessive Force, against Collier, and Count III, Battery – State Law Claim, against Collier.

On April 3, 2024, Collier filed his Motion for Summary Judgment [46].

On May 7, 2024, Plaintiff filed her Opposition to Defendant's Motion for Summary Judgment [ECF54].

On May 20, 2024, Collier filed his Reply to Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment [ECF56].

On July 1, 2024, the Court entered its Order Denying Summary Judgment. This appeal followed.

## II.    Statement of Facts

### A.    Deputies' arrival at the Residence and their Knowledge of Settle.

On November 14, 2020[1], at all relevant times, Collier and Raymond Hart ("Hart") were certified law enforcement officers, employed as Deputies by the Escambia County Sheriff's Office, ("ECSO"), and were on duty at the time of their encounter with Settle. [ECF45-1, 14:13–15:13]. Hart and Collier were in marked units and were both wearing their uniforms.  Neither Collier nor Hart had body-worn cameras issued to them by the Sheriff. [ECF45-1, 29:8–12, 30:20–31:3; ECF45-2, 13:18-19; 43:20–25; ECF45-3, 99:6-12]. However, they were equipped with an in-car camera, which captured audio of certain events that occurred on November 14, 2020. [ECF45-36; ECF45-40].

On the night of November 14, 2020, at 21:41:59 (9:41 pm), Collier and Hart

---

[1] Plaintiff's Complaint [ECF 1, ¶¶28-29} mistakenly states that the date of this incident was November 14, 2021. The correct date for the incident at issue in this lawsuit is November 14, 2020.

were attempting to serve arrest warrants on Settle and his wife, Sophronia Whitehead ("Whitehead"), at their residence located at 2242 Handy Road. The warrants were for failure to appear, tampering with evidence (Whitehead), and driving on a license suspended, second subsequent offense (Settle). [ECF45-4; ECF45-5, 5:10-17; ECF45-6; ECF45-7; ECF45-8; ECF45-9].

In the 10 months prior to November 14, 2020, ECSO had been involved in multiple situations in which Settle attempted to run from law enforcement, both on foot and in his vehicle. Specifically, on February 7, 2020, Escambia County Sheriff's Deputies approached Settle near his residence at 2242 Handy Road and Settle attempted to run away on foot.  [ECF45-10]. On November 3, 2020, a mere 11 days before the incident underlying this matter, Settle disobeyed an ECSO Deputy's directive to stop his vehicle and fled. [ECF45-9]. Whitehead acknowledged that Settle had a history of running from the police, admitting he previously had run from the police in his truck. [ECF45-11, 58:10-18; 59:15-21; 91:22-25; ECF45-12, 6:16-22;].

ECSO call history records show that there had been numerous calls to the residence at 2242 Handy Road in the year before November 14, 2020. [ECF45-13,]. In fact, Hart had been at the residence to serve a warrant on Settle in June 2020; therefore, Hart was able to recognize Settle when he saw him again on November 14, 2020.  [ECF45-2, 46:12– 47:7].

4

Whitehead[2] testified that she had been a passenger in Settle's truck, which he had driven to their residence earlier on the morning of November 14, 2020, after they spent the prior night out at a friend's house. [ECF45-11, 35:10-17, 71:5-15, 76:13-24; 84:22-25]. She stated that he parked the truck "almost up against the house" beside the porch. [ECF45-11, 95:22-25; ECF45-14; ECF45-15,]. She said this was not the location where Settle normally parked the truck. [ECF45-11, 103:1-3].

Whitehead acknowledged that Settle had his methamphetamine pipe and paraphernalia in the truck that night. [ECF45-11, 93:1-7; ECF45-12, 8:8-24]. Settle's toxicology examination revealed a positive finding for amphetamine, methamphetamine, and THC. [ECF45-16].

### B. **Deputies Approach Settle's Residence.**

The CAD Report shows that the Deputies were on scene at 2242 Handy Road at 21:40:03 (9:40 pm). [ECF45-4]. Collier and Hart left their marked patrol car down the street from the residence and approached the residence on foot. [ECF45-1, 28:21–29:7; 30:5–19; ECF45-5, 7:3-9]. First, the Deputies went to the front door in an attempt to make contact with Settle and Whitehead. When no one came to the door, Collier and Hart walked toward the backyard. Collier could see a black truck parked facing the house, adjacent to the porch. [ECF45-1, 33:4-23; ECF45-5, 8:1-

---

[2] In her deposition, Whitehead referred to Jacob Settle, Sr. as "Jake."

5

25; ECF45-17].

The lighting conditions in the backyard were "pitch black," as described by Whitehead. There was no porch light or any other light in the backyard. [ECF45-11, 107:2-6, 128:2–8; ECF45-18, ECF45-19, ECF45-20]. Hart and Collier described the lighting conditions in the backyard as "very dark." [ECF45-2, 44:10–11; ECF45-1, 33:20-23]. The only lights in the backyard were coming from the deputies' flashlights. [ECF45-11,107:2–6].

Before the Deputies entered the backyard, Settle got into the truck "a second before" Whitehead did, and she and Settle first noticed the flashlights when she had one foot in the truck and one foot on the ground. [ECF45-11, 108:9–25, 110:3–8]. Whitehead observed "Maglites or flashlights" coming around the side of the house. At this moment, the truck engine was not turned on and the truck's windows were up. [ECF45-11, 105:25–106:9; ECF45-2, 44:1-11; ECF45-1, 40:11-21]. Whitehead was in the passenger seat and Settle was in the driver's seat. [ECF45-5, 29:19-23; ECF45-1, 40:11-21; ECF45-27, 9:21-24].

### C.    The Deputies' Approach to the Truck.

Collier and Hart approached the truck to ascertain if Settle and Whitehead were in it due to the dark tinted windows. [ECF45-1, 40:9-16; ECF45-5, 9:2-5, 10:16-25; ECF45-2, 24:4-6; ECF45-28, ECF 45-29].  Not only was the backyard pitch black, but there was a lot of debris including, but not limited to, tires, an AC

6

unit, a couch, a chair, and a sink. [ECF45-1, 46:9-13; ECF45-5, 10:16-21, ECF45-11, 96:4–97:2; ECF45-15; ECF45-21; ECF45-22; ECF45-23; ECF45-24; ECF45-25; ECF45-26].

Whitehead knew it was the police and that they were coming for either her or Settle because they both had outstanding warrants. [ECF45-11, 113:7–16, 118:22-25, 126:1–2]. Settle suspected he had a warrant for a violation of probation and was worried he would go to jail or prison. [ECF45-11, 65:19-66:8]. Settle and Whitehead did not get out of the truck when they saw the law enforcement officers. [ECF45-11, 117:24–118:3]. Instead, Whitehead tried to "slump down" in her seat so as not to be seen. [ECF45-11, 110:20–111:20; ECF45-1, 40:11-21; ECF45-5, 11:1-15]. Neither she nor Settle was wearing a seatbelt. [ECF45-11, 118:10–16]. Whitehead could plainly see the deputies' law enforcement uniforms when she was in the truck. [ECF45-11, 112:19-25; 114:9–11; 117:15–118:3]. Settle knew the Deputies were law enforcement. [ECF45-11, 119:18–19].

Collier approached the truck from the driver's side and Hart approached from the passenger side. [ECF45-2, 44:5-9; ECF45-1, 38:24–39:2]. The Deputies observed that the vehicle was not running and there were no lights on in the truck. [ECF45-1, 41:19-21; ECF45-5, 10:1-6; 10:22-25; ECF45-2, 27:5-7, 44:1-11].

Hart remained on the passenger side of the vehicle and Collier on the driver's side of the vehicle from the time they first approached the vehicle until shots were

fired.  [ECF45-2, 44:12–23]. Whitehead said that one Deputy was on her side of the truck and the other Deputy was on Settle's side of the truck, "at his window and the front side of the windshield."  [ECF45-11, 141:2–9].

There were a lot of obstacles, including debris, in the yard and there was limited space for Collier to move given his location between the truck, the house, and the enclosed porch. [ECF45-1, 46:9-14; ECF45-5, 14:19-24; ECF45-15; ECF45-22; ECF45-30; ECF45-31; ECF45-32; ECF45-33].



Collier and Hart observed Whitehead slumped over, leaning towards the left on the passenger side of the truck. [ECF45-1, 40:11-21; ECF45-5, 11:9-15; ECF45-

27, 9:19-24]. According to Whitehead, when the Deputies saw her, they said, "Open your doors. Unlock your doors or we're going to bust your windows out…" [ECF45-11, 121:7-10]. Whitehead also testified that the Deputies then said: "We are looking for Jake Settle" and when Settle asked them why they were looking for Jake Settle, the Deputies responded, "Don't be stupid, boy. You know why we are looking for you." [ECF45-11, 120:25–121:6]. At the time this conversation took place with the Deputies, the truck engine was still off. [ECF45-11, 124:10–125:2].

Settle did not attempt to open his door, and Collier was unable to open the driver's door because it was locked. [ECF45-11, 122:12–25; ECF45-1, 41:16–42:1; ECF45-5, 35:13-20]. Collier then attempted to break the driver's side window with his baton. [ECF45-1, 43:15-17; ECF45-5, 13:11-14]. Whitehead, in her sworn statement to FDLE, acknowledged that Collier said he was going to "bust" the window. [ECF45-12, 3:21-4:1].

It was at this moment, while Collier and Hart were positioned on each side of the truck, in the dark, surrounded by debris, a house, and an enclosed porch, that Settle, rather than complying with their lawful commands to exit the vehicle, "cranked the truck" and put it into gear. [ECF45-11, 121:18–122:5; 122:18-21; 126:2–6; 130:2–4; 137:1–7; ECF45-12, 4:7-9].

Hart and Collier saw Settle change gears. [ECF45-2, 25:8-13; ECF45-27, 5:11-14; ECF45-1, 44:9-15]. Whitehead also testified that Settle put the truck into

9

gear. [EF45-12, 4:7-9]. A photograph taken on the night of the incident shows the truck's gear shift position. [ECF45-34]. Another photograph taken during daylight hours shows the gear shift position in the parked position. [ECF45-35]. When these two photographs are compared, it is obvious that the gear shift was not in park on the night of the incident.

Whitehead stated that when Settle started the engine, it made a loud noise because the truck had "pipes on it, so it's loud." [ECF45-11, 136:4–6]. According to Whitehead, someone stole the catalytic converter from the truck so there are "treble pipes," and it is louder than a regular truck. [ECF45-11, 143:21–144:8; ECF45-1, 48:11-19].

After failing to break the driver's side window, Collier, who was leaning against the truck when Settle started the truck and put it into gear, put his baton away, dropped his Maglite, and attempted to push himself away from the truck. [ECF45-5, 14:1-20; ECF45-1, 46:4–47:8; ECF45-37, ECF45-38]. Hart also moved away from the truck to avoid getting hit by the passenger-side mirror. [ECF45-27, 4:1-11, 5:1-10; ECF45-2, 40:13-18].

As Collier moved away from the truck, he tripped over something in the yard, landing on his left knee and causing injury to his left leg. Collier feared for his life as he regained his footing and continued to attempt to put space between himself and the truck. [ECF45-5, 14:15–15:25, 39:1-19; ECF45-1, 50:1-9; ECF45-39].

After regaining his footing, Collier, still fearful the truck would hit him, drew his service weapon, because he was trapped on the driver's side, between the truck, the house, the enclosed porch, and debris. [ECF45-1, 50:12–51:6].



SET1-000614

Hart was in danger on the other side of the truck, but he had the ability to move away from the truck. [3] [ECF45-21]. In an effort to get away from the truck, Collier moved to his right as far as he could, but he still had no way to escape.

---

[3] Hart, while fearful for his and Collier's safety, did not fire any shots, because Whitehead was in the passenger's seat, he did not know where Collier was specifically located on the other side of the truck, and because of his position, he was concerned about crossfire. [ECF45-2, 26:22–27:4, 41:3-13, 52:5-10; ECF45-27, 4:13-22].

11

[ECF45-1, 52:11–25]. Collier fired two shots into the driver's side of the truck. When he fired his weapon, Collier was trying to continue to move and avoid the vehicle at the same time. [ECF45-1, 53:1–54:2]. In that moment as everything unfolded, Collier believed his life and Hart's life were in danger. [ECF45-1, 46:22-24, 55:14-56:10, 57:10-17, 92:8-11].

A recording from the incident contains audio of a verbal communication between Collier and Hart at the scene, after the shooting occurred. Collier is heard saying: "He put it in drive. I thought he f***ing pulled forward when I was forward." Hart is heard responding: "He did. He did." [ECF45-40].

Whitehead was placed in the back of the patrol car while CPR was being administered to Settle. A video recording from inside the patrol car captured Whitehead saying, "why did [Settle] drive?" and "why did he move the stupid truck," "I told him they were going to kill him," "his mind's not right," "why did he drive, he shouldn't have done that." [ECF45-36– 2:10-3:40]. [4]

---

[4] Whitehead, in her deposition, stated she believes that in the recording she was saying "why did he *try*, he shouldn't have done that." [ECF45-11, 146:4–148:22]. Whitehead did admit she stated that Settle "shouldn't have done that." [ECF45-11, 148:11-15]. The recording itself is the best evidence of what was said at the time. See *Scott v. Harris*, 550 U.S. 372, 380 (2007) ("where video evidence is conclusive witness testimony cannot be used to introduce a factual dispute).

Whether the truck moved or not is immaterial to the Court's analysis concerning qualified immunity and clearly established law because it is evaluated from the perspective of a reasonable officer facing the exact same situation Collier faced on the night of November 14, 2020. Regardless of whether the truck actually moved or

Collier fired only two shots from his weapon, and neither he nor Hart fired their guns after they regained control of the situation. [ECF45-1, 57:18-24].

From the time the Deputies first approached the vehicle until shots were fired, approximately one minute elapsed. [ECF45-2, 45:6–9; ECF45-1, 43:15-23, 87:1-7]. Hart (Deputy 388) reported at 21:45:55 that they were "10-4 / 10-6 / 10-70 CHANNEL 7" meaning that they were "OK" and "busy" and "Switching to Channel 7. [ECF45-4, p.4; ECF45-41; ECF45-2, 46:17-19]. At 21:47:29, Hart reported "SHOTS FIRED." At 21:47:37 a "SIG 36" meaning "Officer in Trouble". [ECF45-4, p.4; ECF45-41].

D.  **After the Shooting.**

At 21:48:04, EMS was notified and at 21:48:45. it was reported that Settle had "2 GSW" meaning gunshot wounds. [ECF45-4, p.4]. ECSO crime scene was called out to the scene just minutes after the shots were fired. ECSO crime scene took photographs and preserved the scene. Additionally, the next day, ECSO crime scene took photographs of the abrasions on Collier's leg. [ECF45-39].

ECSO Sgt. Chase Horne arrived on scene while EMS was still working on Settle. He observed that the vehicle was still on, with the engine running. The fire department arrived and requested the vehicle be turned off for safety reasons, which

---

whether the officer perceived that the truck moved, qualified immunity should be granted.

Horne requested a deputy do but instructed the deputy to leave the vehicle in gear, as it was found. [ECF45-44, 5:1-23]

FDLE arrived at the scene and the investigation was handed over to them, which is routine for officer-involved shootings. [ECF45-45]. Special Agent Kinard, the FDLE case agent, arrived on scene and directed FDLE Crime Laboratory Analysts Wilkerson's and Martelli's activities in processing the scene, taking photographs, and collecting evidence. Wilkerson also took various photos documenting the scene, including processing a FARO 3D laser scanner. [ECF45-46; ECF45-49; ECF45-50]. In an interview conducted by FDLE, Whitehead stated that Settle was not in his right mind because he had been using methamphetamine. [ECF45-12, 6:1-6, and ECF45-11, 139:11-25].

An attempt was made to photograph the gear shift indicator of the truck; however, it was determined that the gear indicator was not working. [ECF45-47, 31:3-11; ECF45-48, 31:25–32:5; 33:2-6].

Prior to this incident, Collier had never been involved in an officer-involved shooting. [ECF45-1, 93:2-7].

### III.    Statement of Standard of Review

When the District Court grants or denies a summary judgment motion, this Court's review of the same is *de novo*. *Ellis v. England*, 432 F.3d 1321, 1325 (11th

14

Cir. 2005). Summary judgment orders which deny qualified immunity are also reviewed *de novo*. *Williams v. Aguirre*, 965 F.3d 1147, 1156 (11th Cir. 2020).

For the purposes of summary judgment, facts are viewed in the light most favorable to the non-moving party; however, when "opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of facts." *Jackson v. Sauls*, 206 F.3d 1156, 1164 (11th Cir. 2000); *Scott v. Harris*, 550 U.S. 372, 380 (2007).

The evidence is viewed in the light most favorable to the non-moving party, but with the caveat that this Court can rely on the record evidence such that it contradicts the non-moving party's version of events, because "the 'issues appealed here concern 'not which facts the parties might be able to prove, but, rather, whether or not certain given facts showed a violation of 'clearly established law.'" *Morton v. Kirkwood*, 707 F.3d 1276, 1280 (11th Cir. 2013) (citing *Sheth v. Webster*, 145 F.3d 1231, 1236 (11th Cir. 1998) (per curiam) (quoting *Johnson v. Jones*, 515 U.S. 304, 311 (1995)).

Summary Judgment is appropriate "if the moving party establishes that there are no genuine issues as to any material fact and he is entitled to a judgment as a matter of law." *Livernois v. Medical Disposables, Inc.*, 837 F.2d 1018, 1022 (11th Cir. 1988).

## SUMMARY OF THE ARGUMENT

Collier respectfully submits that the District Court erred when it denied Collier qualified immunity, and thus summary judgment, because controlling authority establishes Collier did not violate Settle's constitutional rights. Even under Whitehead's version of events, the circumstances were tense, rapidly evolving, and not within the complete control of Collier. Collier had an objectively reasonable belief that deadly force was necessary because his and Hart's lives were in danger when Settle, after attempting to conceal himself and Whitehead in the truck, grabbed the keys, put them in the ignition, started the engine, and put the truck into gear, all while refusing lawful commands to exit the vehicle and while Collier was trapped between the truck and the house and enclosed porch, with no exit after he had fallen over debris. Additionally, there is no case that "squarely governs" and which would have put the constitutional rights question beyond debate; thus, any reasonable officer facing the same set of circumstances as Collier would not have known that firing two rounds into the driver's side window of a truck when the officer was trapped in front of the driver-side mirror of the truck, the house, and the enclosed porch, without an exit after the suspect failed to abide by lawful commands and started the truck and put it into gear, would violate the law. Thus, Collier is entitled to Qualified Immunity. For these same reasons, the District Court erred in denying

16

Collier state-agent immunity pursuant to Florida Statutes §768.28(9). This case presents critical questions for the Eleventh Circuit.

## ARGUMENT AND CITATIONS OF AUTHORITY

### I.    Defendant/Appellant David Collier is entitled to Qualified Immunity.

#### A.    Qualified Immunity Standard

Public officials are entitled to qualified immunity, which means immunity from suit, unless they have violated a clearly established law or constitutional right. *City & Cnty. Of San Francisco v. Sheehan*, 575 U.S. 600, 611-12 (2015) (citing *Plumhoff v. Rickard*, 572 U.S. 765, 778-79 (2014) internal quotation marks omitted)). A right is clearly established only when "the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Sheehan*, 575 U.S. at 611 citing *Plumhoff*, 572 U.S. at 778-79. That means "existing precedent…placed the statutory or constitutional question beyond debate." *Sheehan*, 575 U.S. at 611 citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011). Thus, "[q]ualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions…protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *al-Kidd*, 563 U.S. at 745 citing *Malley v. Briggs*, 475 U.S. 335, 341 (1986). See also *Sheehan*, 575 U.S. at 611.

17

If reasonably competent officers in the same situation "could disagree on this issue, immunity should be recognized." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Courson v. McMillian*, 939 F.2d 1479, 1497 (11th Cir. 1991) (quoting *Id.*).

While there need not be a case directly on point to create clearly established law, the Supreme Court, as the Eleventh Circuit has noted, has been careful to reiterate time and again that a district court need "not to define clearly established law at a high level of generality." *Gates v. Khokar*, 884 F.3d 1290, 1302-03 (11th Cir. 2018) (citing *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) internal citations omitted)). See also *White v. Pauly*, 580 U.S. 73, 79-80 (2017)(the unlawfulness must be apparent as generalities do not clearly define law such that it would strip an officer of qualified immunity); *Sheehan*, 575 U.S. at 613 ("Qualified immunity is no immunity at all if 'clearly established' law can simply be defined as the right to be free from unreasonable searches and seizures."); *Plumhoff*, 572 U.S. at 779 (defining law by generalities "avoids the crucial question whether the official acted reasonably in the particulate circumstances that he or she faced.").

A deputy must demonstrate that he was acting within the course and scope of his employment and within his discretionary authority when he asserts qualified immunity. *Durruthy v. Pastor*, 351 F.3d 1080, 1087 (11th Cir. 2003) (citing *Lee v.

*Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002)).  After it is established that the deputy was acting within the course and scope of his discretionary authority, the burden shifts to the plaintiff to establish that the deputy is not entitled to qualified immunity. *Pearson v. Callahan*, 555 U.S. 223 (2009); *Bennett v. Hendrix*. Plaintiff must establish (1) the facts alleged make out a violation of a constitutional right; and (2) the constitutional right was clearly established at the time of the alleged misconduct. *Pearson*, 555 U.S. at 232 citing *Saucier v. Katz*, 533 U.S. 194, 200 (2001); see also *Perez v. Suszczynski*, 809 F.3d 1213, 1218 (11th Cir. 2016) and *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1264 (11th Cir. 2004). This Court may now address the qualified immunity inquiry in any order. *Pearson*, 555 U.S. at 236.

It is undisputed that Collier was acting within his discretionary authority as a deputy with the ECSO when he attempted to execute valid arrest warrants on Settle and Whitehead. [ECF45-1, 14:13–15:13]. Whitehead stated in her sworn deposition that she knew the Deputies were law enforcement and she knew that she and Settle had active warrants for their arrest. [ECF45-11, 113:7–16, 118:22-25, 126:1–2]. Additionally, Plaintiff/Appellee cannot identify any controlling authority, as no Supreme Court, Eleventh Circuit, or Florida Supreme Court cases exist, that clearly establishes Collier's actions—after Settle refused lawful commands, then started the engine of the truck and put the truck in gear, while it was pitch black and Collier was

trapped between the truck, the house, the enclosed porch, and surrounded by debris—violated Settle's constitutional rights, including the Fourth Amendment, such that the Fourth Amendment question would be beyond debate. Therefore, Collier should be entitled to Qualified Immunity.

### B.    <u>There was no Fourth Amendment Violation.</u>

When evaluating use of force under the Fourth Amendment's reasonableness standard, "a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against countervailing governmental interests at stake" needs to occur "under the facts of the particular case." *Graham v. Connor*, 490 U.S. 386, 396 (1989) (quoting *Tennessee v. Garner*, 471 U.S. 1, 7-8 (1985)(internal quotations omitted); *Davidson v City of Opelika*, 675 Fed. App'x 955, 958 (11th Cir. 2017) (citing *Salvato v. Miley*, 790 F.3d 1286, 1293 (11th Cir. 2015)).

Courts must be careful to view the facts "from the perspective of a reasonable officer on the scene with knowledge of the attendant circumstances and facts, and balance the risk of bodily harm to the suspect against the gravity of the threat the officer sought to eliminate." *McCullough v. Antolini*, 559 F.3d 1201, 1206 (11th Cir. 2009) (relying on *Scott v. Harris*, 550 U.S. 372, 383 (2007)). "'The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable

officer on the scene, rather than with the 20/20 vision of hindsight.'" *McCullough*, 559 F.3d at 1206 citing *Graham*, 490 U.S. at 396. Most importantly, "[t]he calculus of reasonableness **must** embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *McCullough*, 559 F.3d at 1206 citing *Graham*, 490 U.S. at 396-97 (emphasis added). See also, *Kisela v. Hughes*, 138 S.Ct. 1148, 1152 (2018) (quoting *Graham*, 490 U.S. at 396-97). As recognized by this Circuit, "'the test for reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application.'" *McCullough*, 559 F.3d at 1206 citing *Long v. Slaton*, 508 F.3d 576, 580 (11th Cir. 2007) (internal quotations omitted).

A police officer may use deadly force where the officer: (1) "has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others" or "that he has committed a crime involving the intentional infliction of serious physical harm;" (2) reasonably believes that the use of deadly force was necessary to prevent escape; and (3) has given some warning about the possible use of deadly force, if feasible. *McCullough* at 1206 (11th Cir. 2009) (citing *Vaughan v. Cox*, 343 F.3d 1323, 1329-30 (11th Cir. 2003). "[I]f the suspect threatens the officer with a weapon" then it is constitutionally permissible to use deadly force. *McCormick v. City of Ft. Lauderdale*, 333 F.3d 1234, 1246 (2003) (citing *Tennessee*

21

*v. Garner*, 471 U.S. 1, 11 (1985)). This Court should weigh the level of force used against (1) the severity of the crime, (2) the immediacy of the threat posed by the suspect, and (3) whether the suspect sought to evade or resist arrest. *Lee v. Ferraro*, 284 F.3d 1188, 1197-98 (11th Cir. 2002).

The reasonableness of deadly force is a question of law, and this Court "must still slosh [its] way through the factbound morass of 'reasonableness.'" *Scott v. Harris*, 550 U.S. 372, 383 (2007). For that reason, the constitutional test for excessive force is necessarily fact specific." *McCullough*, 559 F.3d at 1206. Specifically, "*Garner* did not establish a magical on/off switch that triggers rigid preconditions whenever an officer's actions constitute 'deadly force,'" but rather constitutes an application of the Fourth Amendment's "reasonableness test" to the use of a particular type of force, in a particular situation. *Scott*, 550 U.S. at 382. Furthermore, this Court has held "[i]f an officer reasonably, but mistakenly, believes that one of the facts relevant to the merits of the constitutional excessive-force claim is present, the officer is justified in using more force than in fact was needed." *Williams v. Deal*, 659 F. App'x 580, 597-98 (11th Cir. 2016).

In *Crosby v. Monroe Cnty.*, 394 F.3d 1328, 1333-34 (11th Cir. 2004), this Court recognized when:

> making an excessive force inquiry, we are not to view the matter as judges from the comfort and safety of our chambers, fearful of nothing more threatening than the occasional paper cut as we read a cold record accounting of what turned out to be the facts. We must see the situation

22

> through the eyes of the officer on the scene who is hampered by
> incomplete information and forced to make a split-second decision
> between action and inaction in circumstances where inaction could
> prove fatal.

Relying on *Graham v. Connor*, 490 U.S. 386, 396-97 (1989); *Kesinger ex rel. Estate of Kesinger v. Herrington*, 381 F.3d 1243, 1248-5 (11th Cir. 2004); *Garrett v. Athens-Clarke Cnty.*, *Ga.,* 378 F.3d 1274, 1279 (11th Cir. 2004).

While this Court construes facts in the light most favorable to Plaintiff, it determines "reasonableness from the perspective of 'a reasonable officer on the scene at the time the events unfolded,'" and the "only perspective that counts is that of" the Deputies on scene at the time of the incident. *Tillis on behalf of Wuenschel v. Brown*, 12 F.4th 1291, 1299 (quoting *Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 821 (11th Cir. 2010)).

Here, the evidence, when viewed in the light most favorable to Plaintiff/Appellee, establishes that the events unfolded in less than one minute, in a backyard that was pitch black and covered in debris. Individuals who had active warrants for their arrest were hiding in a pickup truck. The Deputies could not see clearly into the truck because the windows were tinted and there were no lights in the backyard. When the Deputies approached the truck, it was off. Collier approached the driver's side of the truck and was positioned in such a way that escape was impossible; he was trapped by the truck, the house, the enclosed porch, and surrounded by an AC unit, chair, and other debris. Hart approached the

passenger side of the truck. Based on the testimony from the Deputies and Whitehead, Settle, rather than complying with lawful commands to exit the vehicle, started the engine and put the truck into gear. When the truck started, it made a loud noise. Collier, startled by the loud sound, fell as he was attempting to get away from the truck. When he realized he could not get away because he was trapped by the house, the enclosed porch, the truck, and the surrounding debris, in fear for his safety, and the safety of Hart, Collier fired two shots through the driver's window. Once Collier believed his life and Hart's life were no longer in danger, Collier did not fire any more shots. Settle then exited the vehicle and first aid was rendered.

In *Davidson v. City of Opelika*, 675 Fed. App'x 955, 958 (11th Cir. 2017), this Court held "analysis of this balancing test is governed by (1) the severity of the crime at issue; (2) whether [Settle] posed an immediate threat to [Collier] or others; (3) whether he actively resisted arrest." This Court has previously held that even if two of the three elements are absent, but there are sufficient facts to support the second factor, *i.e.*, whether Settle posed an immediate threat, then summary judgment is proper on an excessive force claim. *See Davidson v. City of Opelika*, 675 Fed. App'x 955, 958-60 (11th Cir. 2017). Moreover, this Court held the use of deadly force does not violate the Constitution when the suspect poses a threat of serious bodily harm to deputies or others. *Penley v. Eslinger*, 605 F.3d 843, 851 (11th Cir. 2010). This Court recently held "[i]t is reasonable, and therefore constitutionally permissible, for

an officer to use deadly force when he has probable cause to believe that his own life is in peril." *Tillis on behalf of Wuenschel v. Brown*, 12 F.4th 1291, 1298 (11th Cir. 2021) (quotation marks omitted). *See also Harris-Billups v. Anderson*, 61 F.4th 1298, 1302 (11th Cir. 2023)(more than one course of action can be reasonable and when an officer has probable cause to believe a suspect is a danger to himself or others, deadly force is reasonable, especially when the suspect is not in his right mind).

Probable cause, as emphasized by the Supreme Court, "is not a high bar." *District of Columbia v. Wesby*, 583 U.S. 48, 57 (2018) (citing *Kaley v. U.S.*, 571 U.S. 320, 338 (2014). Probable cause "exists when the 'facts and circumstances [are] sufficient to warrant a prudent' officer in reaching that conclusion." *Harris-Billups*, 61 F.4th 1298, 1302 (citing *Black v. Wigington*, 811 F.3d 1259, 1267 (11th Cir. 2016) (defining "probable cause"). When an officer in the same set of circumstances could conclude probable cause existed, deadly force is justified.

Analyzing these facts from the perspective of a reasonable officer on scene, facing the exact same situation that Collier faced, Settle posed a threat to Collier and Hart, because it was reasonable to interpret by Settle's actions that he had no regard for the safety of the deputies or others. When Collier and Hart walked around to the backyard, they had to use their flashlights due to the darkness. Because of the tint on the truck's windows, they could not see inside the truck without approaching it

closely. Collier went to the driver's side and Hart approached the passenger's side. Upon approach, Collier and Hart saw Settle and Whitehead attempting to hide themselves inside the truck. At this time, the truck was off. Instead of complying with lawful commands, Settle started the engine, which startled Collier and Hart and caused Collier to drop his flashlight, trip over something in the yard, and fall. [ECF45-1, 50:1-14]. Only seconds passed between Settle starting the truck and Collier firing two shots to protect himself and Hart from Settle's actions. Collier knew it was dark, he was trapped, and Settle's truck (after Settle started the truck and put it into gear after being lawfully commanded to exit) could run him or Hart over and seriously injure or kill them.

This Court has continuously held that deputies are not required to wait and see before using deadly force in situations that are rapidly evolving, tense, and uncertain, as Collier faced here. See *Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 821 (11th Cir. 2010)("Regardless of whether Jean-Baptiste had drawn his gun, Jean-Baptiste's gun was available for ready use, [] Guiterrez was not required to wait 'and hope[] for the best.'") While Settle was hiding in a truck, and ultimately not in possession of a gun, the facts as Collier knew them when he approached the vehicle was that he and Hart were there to serve arrest warrants on Settle and Whitehead. It was dark. The truck was off. When Settle started the engine and put the truck into gear, the vehicle became a deadly weapon, which gave Collier, in those seconds,

probable cause to believe Settle posed a danger to himself and Hart, justifying the use of deadly force.

Looking to *Long v. Slaton*, 508 F.3d 576, 580-81 (11th Cir. 2007), wherein the suspect was driving a vehicle, the facts established that suspect was reversing away from the officer, and had not driven the vehicle in a threatening manner, when the officer used deadly force. This Court found the officer was entitled to qualified immunity. The Court noted the "obvious" fact that an "objectively reasonable officer" would have known the suspect "could have quickly shifted gears and accelerated towards [the officer] at any time." *Id*. at 581 n. 7.  Thus, this Court found that "[e]ven if [it] accept[ed] that the threat posed by Long to Deputy Slaton was not immediate in that the cruiser was not moving toward Slaton when shots were fired, the law does not require officers in a *tense and dangerous situation* to wait until the moment a suspect uses a deadly weapon to act to stop the suspect." 508 F.3d at 581.

As in *Long*, Whitehead testified that Settle was not in his right mind because he had been using methamphetamine, he had lost his job, he knew he was about to go to jail, he was depressed, and nothing mattered to him. [ECF45-11, 139:21-25]. While Collier did not know Settle's mental state at the time, what he did know was that Settle had a history of fleeing from law enforcement, and that instead of complying with his and Hart's lawful commands, Settle started a truck that was previously off and put it into gear. As this Court has previously held, officers need

27

not wait to see what the suspect intends to do before using deadly force when probable cause exists to believe their lives are in danger.

In *Robinson v. Arrugueta*, 415 F.3d 1252, 1256 (11th Cir. 2005), this Court held the officer was entitled to qualified immunity because he did not violate the decedent's constitutional rights when he used deadly force to protect himself and others. In *Robinson*, the officer was sandwiched in a narrow space between two vehicles and shot the suspect when the suspect disobeyed orders to put his hands up and instead slowly drove the vehicle forward. *Robinson*, 415 F.3d at 1256. This Court noted the mere seconds that officer had to react. *Id*. Specifically, this Court was quick to note the *officer's perspective*, and this Court's precedent that instructs this Court to "take into account that '[r]econsideration [after the uncertainty and the excitement of the moment have passed] will nearly always reveal that something different could have been done if…the future [was known] before it occurred.'" *Id*. citing *Carr v. Tatangelo*, 338 F.3d 1259, 1270 (11th Cir. 2003). This Court noted that even if the officer could have escaped unharmed, "a reasonable officer could have perceived that [the suspect] was using the [vehicle] as a deadly weapon." *Id*. This is why this Court has "refuse[d] to second-guess the officer." *Menuel v. City of Atlanta*, 25 F.3d 990, 997 (11th Cir. 1994).

In *Pace v. Capobianco*, 283 F.3d 1275, 1282 (11th Cir. 2002), this Court held that the suspect had used his car "in a manner to give reasonable policeman probable

28

cause to believe that it had become a deadly weapon with which [he] was armed." In *Brosseau v. Haugen*, 543 U.S. 194, 200 (2004) the Supreme Court held, based on the fact specific instances of that case, that the officer did not violate the Fourth Amendment when the suspect "had proven he would do almost anything to avoid capture and that he posed a major threat to, among others, the officers." (internal quotations omitted).

Based on the cases cited above, when Settle started the truck and put it into gear, after being lawfully commanded to unlock the doors and exit the vehicle, he put Collier and Hart in reasonable fear that their lives were in danger and Collier was under no obligation to wait and see if Settle began to run the Deputies over, miss them while evading arrest, or drive away. Settle's actions could cause a reasonable officer to believe, in those seconds between his approaching the truck and Settle starting the truck and putting it in gear, that the officer's life was in danger, thereby establishing probable cause to justify the use of deadly force. Thus, the District Court erred when it denied Collier qualified immunity and this Court should reverse.

While not a published opinion, this Court held in 2018 that when an officer who conducted a traffic stop for a seat belt violation used deadly force on a driver it was not excessive force. *Spencer v. City of Orlando*, 725 F. App'x 928 (11th Cir. 2018). The facts in *Spencer* are distinguishable in that the driver had previously used his vehicle to hit the officer's vehicle before attempting to flee. However, when the

29

deadly force was used against the driver, the vehicle was stuck between two other vehicles and would not restart. *Id*. at 929-30. This Court held, "the officers were not required to wait until [the suspect] successfully restarted his car and drove toward them before they defended themselves." *Id*. at 932. When the situation is tense and dangerous, officers do not need to wait and see. *Id.* at 933 citing *Long*, 508 F.3d at 1282. Also, in *Spencer*, this Court noted that the third prong was met because, like Settle, the suspect was attempting to evade arrest. *Id*. at 933.

In *Troupe,* this Court found a reasonable officer could have perceived a threat of serious physical harm when the suspect was disobeying the officer's clear orders to put his hands up and surrender. *Troupe v. Sarasota County, Fla.*, 419 F.3d 1160, 1168 (11th Cir. 2005). When the vehicle suddenly moved forward and backward, the officers had to make a split-second decision. Additionally, the three officers surrounding the car separately concluded deadly force was needed and appropriate to stop the suspect, but simply did not shoot because they did not have a clear shot or were worried about crossfire. *Id*. The officer had only 3-5 seconds to assess the situation before shooting. This Court opined that "[e]ven if in hindsight the facts show that the SWAT Team could have escaped unharmed, a reasonable officer could have perceived that [the suspect] posed a threat of serious physical harm." *Id*.

Like in *Troupe*, Collier had mere seconds to assess the scene and act. Record evidence establishes he had less than one minute from the time the deputies located

the truck in the backyard until Settle started the truck and put it in gear. Furthermore, the record evidence is clear that Settle started the truck and put it into gear *after* Collier and Hart directed Settle and Whitehead to unlock the doors and exit the truck. It was dark and Collier and Hart could not see into the truck until they approached it with their flashlights because the windows were tinted. It was not until Collier was on the driver's side of the vehicle trapped by the house, the enclosed porch, the truck, and debris, that Settle, rather than comply with lawful commands, started the truck and put it into gear. Hart, in those seconds, was located on the passenger side of the truck. In mere seconds, Collier had probable cause to believe that his and Hart's lives were in danger based on Settle's refusal to comply with lawful commands and starting a truck that was previously off. As in the cases cited above, Collier need not wait for Settle to run him or Hart over before being justified in using deadly force.

Furthermore, the Eleventh Circuit has never stated that the officer was required to be in the direct path of the moving vehicle to have a reasonable fear for his safety. It is enough that "a reasonable officer would have reasonably perceived that he was in imminent danger of being run over by [the suspect's] car." *Id*. at 1300, quoting *Singletary v. Vargas*, 804 F.3d 1174, 1182 (11th Cir. 2015), where the court held that plaintiff's claim the vehicle's brakes were applied the same moment shots rang out did not create a disputed issue of fact as to whether any danger had dissipated in the split-second immediately preceding the defendant's decision to use

deadly force. The court stated that "[e]ven if in hindsight the facts show that [the defendant] perhaps could have escaped unharmed, we conclude that a reasonable officer could have perceived that [the suspect] was using the [car] as a deadly weapon. Quoting *Long*, 508 F.3d at 581. Additionally, in *Singletary*, the Court was not persuaded that the location of the bullet holes in the side of the car, not the front, supported the conclusion that the defendant was not in danger of being hit by the car. *Singletary*, at 1183-1184.[5]

Recently, in *Bolton v. Wood*, where it was undisputed that the suspect's foot was on the accelerator and the tires were squealing, but the car may have in fact been immobilized, it was held that a reasonable officer could have assumed the car was functional and able to be used as a deadly weapon. *Bolton v. Wood*, 682 F.Supp.3d 1304, 1309-13, 1314-23 (N.D. Ga. 2023), *appeal pending*. It was therefore not unreasonable to assume there was an immediate threat to the officer's safety. *Id*. In *Bolton*, the court, in granting summary judgment, relied on *Spencer v. City of Orlando*, 725 F.App'x 928, 932 (11th Cir. 2018), where the car was disabled, but the plaintiff was attempting to restart the engine, and the court held, "[t]o be clear, the officers were not required to wait until [the suspect] successfully restarted the car and drove toward them before they defended themselves." *Id*.

---

[5] Whether Settle's truck was moving does not create a genuine issue of material fact that would preclude summary judgment based on the totality of the circumstances facing Collier at the time because the case law was not clearly established.

Thus, critical to the analysis is whether a reasonable officer would find that the totality of Settle's actions, in those few seconds, were an immediate threat to the officer's safety. As in *Robinson*, Collier was located only feet from the suspect's vehicle, with objects behind and around him, with only a split second to decide if he was going to be struck by the truck, or possibly pulled under the wheel and crushed. *Robinson*, at 1254. It is undisputed that it was dark in Settle's backyard at the time Collier and Hart were serving the warrant. There was "scrap" debris everywhere in the yard, including an AC unit, a lawn mower, a chair, large tires, a wheelbarrow, piles of trash, a couch, a sink, and pipes. It was only **after** Settle and Whitehead knew they were spotted by Collier and Hart that Settle then placed the keys in the truck's ignition, "cranked it up," and put it into gear. The record evidence is that when the truck was started, it was very loud, described by Whitehead as sounding like a gunshot. When confronted with lawful commands to exit the vehicle, with a Sheriff's Deputy on either side of the vehicle, Settle refused those commands, instead placing the keys into the vehicle, turning it on, and putting it into gear.

Collier fell to the ground, scraping his leg, and was confined in the space in between Settle's truck, which was running and in gear, and the house/porch, surrounded by all of the yard debris. Like in *Troupe*, there was another deputy, Hart, who was on the other side of the vehicle, whom Collier was also concerned for. As in *Troupe*, Hart testified that he too believed deadly force was reasonable and

justified at the time Collier fired the shots, and the only reason Hart did not attempt to fire into the vehicle to stop the danger was his concern for crossfire, and his concern for the passenger, as he did not have a clear line of fire. Collier had only a split second to decide if he was going to be pulled under the truck, or struck by the truck, or if Hart was going to be struck by the truck. Like in *Tillis*, there was no time for Collier to analyze his ability to escape the confined area he was in or to calculate angles and trajectories to determine if he was a few feet outside of harm's way or not.

As in *Davidson* and the other cases cited above, Collier should be entitled to qualified immunity because Collier faced an uncooperative suspect who had an active arrest warrant, who was not in his right frame of mind, who had a history of running from law enforcement, and who actively started a truck and put it into gear while Collier was standing next to the driver's side of the truck trapped by the truck, the house, and the porch, and surrounded by debris. While there is not a video from this incident, the scene is undisputed. The truck made such a loud noise when it started that it startled Collier, causing him to trip over something in the yard and fall as he attempted to back away. Whitehead, the passenger in the vehicle with Settle, testified that the truck made such a loud noise when it started that it sounded like a gunshot. Later, she is heard saying, "why did [Settle] drive?" and "why did he move the stupid truck," "I told him they were going to kill him," "his mind's not right,"

"why did he drive, he shouldn't have done that." [ECF45-36, 2:10-3:40]. There is also audio of the conversation between Collier and Hart where Collier is heard telling Hart "He put it in drive. I thought he f***ing pulled forward when I was forward." Hart is heard responding: "He did. He did." [ECF45-40].[6]

In those tense seconds, not knowing what Settle intended to do once he started the truck and put it into gear, but being trapped by the house, the enclosed porch, and the truck, and surrounded by debris, and knowing Hart was on the other side of the vehicle, Collier made a split-second decision to protect himself and Deputy Hart and prevent Settle from causing any harm when he fired two shots and regained control of the situation. In analyzing Collier's use of deadly force applying the reasonableness test, Collier submits all three of the prongs were met. First, while the arrest warrants for Settle and Whitehead were not for necessarily violent crimes, they did have active arrest warrants. Whitehead testified that she and Settle knew Collier and Hart were law enforcement and that they had active warrants, and that

---

[6] Whether the truck moved or not is immaterial to the Court's analysis concerning qualified immunity and clearly established law because it is evaluated from the perspective of a reasonable officer facing the exact same situation Collier faced on the night of November 14, 2020.

However, Collier submits the recordings are the best evidence and can be considered by this Court. See *Scott v. Harris*, 550 U.S. 372, 380 (2007) ("where video evidence is conclusive witness testimony cannot be used to introduce a factual dispute). Regardless of whether the truck factually moved or whether the officer perceived that the truck moved, qualified immunity should be granted.

they were actively hiding from the Deputies. Second, Settle posed an immediate threat to Collier and Hart when he started a truck that was originally off and put it into gear because Collier was trapped by the house, the enclosed porch, the truck, and surrounding debris, while standing next to the driver's side window, and Hart was on the other side of the truck standing right next to it. Third, after attempting to conceal himself and Whitehead inside the truck, Settle refused lawful commands to unlock the doors and exit the vehicle and instead responded by starting the truck and putting it into gear. Therefore, Collier did not violate Settle's constitutional rights and, respectfully, the District Court erred when it found he was not entitled to qualified immunity. Based on the specific facts and circumstances faced by Collier, and from the perspective of a reasonable officer facing those specific facts and circumstances, Collier is entitled to qualified immunity and this Court should reverse the District Court.

### C.    There is no case that would have put Collier on notice.

Respectfully, the District Court did not cite a case that "squarely governs" and, as in *Brosseau* and *Mullinex*, it is clear that "this area is one in which the result depends very much on the facts of each case." *Brosseau*, 543 U.S. at 201. There is not a case that would have put Collier on notice that using deadly force in the situation he faced on the night of November 14, 2020 would violate someone's constitutional rights such that he would not be entitled to Qualified Immunity. The

cases relied on by the District Court "by no means 'clearly establish' that [Collier's] conduct violated the Fourth Amendment." *Brosseau*, 543 U.S. at 201. Rather, the clearly established law regarding deadly force is that it is "not constitutionally unreasonable" to use deadly force "[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." *Brosseau v. Haugen*, 543 U.S. 194, 197-98 (2004) (citing *Tennessee v. Garner*, 471 U.S. 1, 11 (1985)).

A plaintiff can demonstrate that a right was clearly established by (1) producing "a materially similar case decided by the Supreme Court, this Court, or the highest court of the relevant state" or (2) "point to a 'broader, clearly established principle [that] should control the novel facts in [his] situation'" or (3) "that an 'official's conduct 'was so far beyond the hazy border between excessive and acceptable force that [the official] had to know he was violating the constitution even without a case on point.'" *Morton v. Kirkwood*, 707 F.3d 1276, 1282 (11th Cir. 2013) citing *Hoyt v. Cooks*, 672 F.3d 972, 977-78 (11th Cir. 2012); *Mercado v. City of Orlando*, 407 F.3d 1152, 1159 (11th Cir. 2005); *Priester v. City of Riviera Beach*, 208 F.3d 919, 926 (11th Cir. 2000) (alteration in original) (quoting *Smith v. Mattox*, 127 F.3d 1416, 1419 (11th Cir. 1997)(per curiam)). To be sufficiently clear, "every reasonable officer would have understood that what he was doing violates that right." *Prosper v. Martin*, 989 F.3d 1242, 1251 (11th Cir. 2021).

"This Circuit in *McCullough* acknowledged that it has had occasion to review many excessive force claims against officers in the context of qualified immunity determinations where the decedent was driving an automobile at the time deadly force was used," and in some cases this Court found "that the officers were not entitled to qualified immunity" and in some cases this Court has "awarded qualified immunity[,]" which establishes the law is not clearly established but rather depends on the specific facts faced by the officer on scene. 559 F.3d at 1207. Furthermore, this Court has "consistently upheld an officer's use of force and granted qualified immunity in cases where the decedent used or threatened to use his car as a weapon to endanger officers or civilians immediately preceding the officer's use of deadly force." *McCullough*, 559 F.3d at 1207. The logic behind [] 'consistently up[holding]' the use of lethal force against a suspect using a vehicle as a weapon against officers or civilians is obvious: a car is a powerful machine that can easily maim or kill a human being. By incapacitating or killing the driver, the officer has a better chance of escaping injury and reducing the harm that the driver might cause." *Robinson v. Rankin*, 815 Fed. Appx. 330, 341 (11th Cir. 2020).

The District Court relied primarily on *Morton v. Kirkwood*, 707 F.3d 1276, 1282 (11th Cir. 2013), but Collier respectfully submits that reliance was misguided as the facts were not so similar that it would have put Collier on notice that his actions on November 14, 2020 would have violated clearly established law or

38

Settle's constitutional rights. In *Morton*, the officer shot the suspect *after* the suspect put the vehicle into park. *Morton v. Kirkwood*, 707 F.3d 1276, 1279 (11th Cir. 2013). The officer had no probable cause to believe Morton had committed a crime. *Morton*, 707 F.3d at 1281. Here, Settle and Whitehead had valid warrants for their arrests, of which Collier was aware. Unlike in *Morton*, Settle did not shift his vehicle into park and put his hands up before Collier fired two shots; rather, Settle undisputedly started his truck and put it into gear. *Id*. at 1282. Whether Settle's truck moved is immaterial to the analysis from a reasonable officer's perspective, because Settle intentionally disregarded lawful commands to unlock he doors and exit the vehicle and actively attempted to evade arrest by starting the truck and shifting it into gear, thus making the truck a threat of a deadly weapon. Settle's truck, unlike in *Morton*, became a dangerous weapon when Settle cranked it and undisputedly put it into gear. Thus, Settle put Collier's and Hart's lives in danger and Collier would not have known based on *Morton* that his actions would have violated Settle's constitutional rights.

The District Court also relied on *Vaughan v. Cox*, 343 F.3d 1323, 1325-26 (11th Cir. 2003), where officers received reports of a stolen vehicle, which they located travelling on a highway. The stolen vehicle hit the back of one of the officers' vehicles and then accelerated, rather than stop. *Id.* At this point, one officer readied his weapon and, as the vehicle sped past him, he fired three shots into it. *Id*. One of those three shots hit the passenger, paralyzing him. *Id*. The facts are so different from

39

what Collier faced on November 14, 2020 that *Vaughn* could not have reasonably put Collier, or any other officer, on notice that deadly force was not permissible such that he would not be entitled to qualified immunity. In *Vaughan*, this Court determined that the suspect's flight did not present an immediate threat of serious harm to the officer because the suspect was travelling on a highway and his lane of traffic was clear. *Id.* at 1330. Second, the use of deadly force was not necessary to prevent escape because the truck, with the trailer attached, was easily identifiable and one police cruiser was even with the truck while another was following. *Id*. at 1330-31. Third, the officer who fired the shots was following beside the vehicle for 30-45 seconds and had plenty of time to warn the suspect of the shooting. *Id*. at 1331. None of those facts existed for Collier. Collier approached a dark vehicle in a pitch-black backyard looking for two individuals who had active warrants for their arrests. When he approached, the windows were tinted so darkly that he had to use his flashlight and get right next to the driver's side door to see inside. He saw two individuals attempting to hide from law enforcement. When he lawfully commanded the suspects to exit the vehicle, Settle responded by grabbing keys, starting the truck, and putting it in gear. The undisputed evidence is that the truck, when started, made a loud noise, which caused Collier to fear for his safety.  While Collier attempted to get away from the truck, he fell over the debris in the yard. Still in fear and mere seconds after the truck started, Collier fired two shots. Unlike *Vaughn*, Settle was

not travelling on a roadway attempting to evade capture. Settle was hiding in a truck that was off before the officer approached—a truck that Settle started after being located by the officers and being lawfully commanded to unlock the doors and exit the truck. Unlike *Vaughn*, Collier did not have 30 to 45 seconds to warn Settle of his intent to use deadly force. Less than one minute elapsed from the time Collier and Hart approached the truck until the time Collier fired the two shots, and it was mere seconds that elapsed between the time Settle started the truck and put it into gear that Collier fired two shots after trying to move himself away from the truck. [ECF45-4, p.4, 21:46:30-21:47:29]. In fact, as this Court has continuously held, officers do not have to warn when it is impracticable, as it was here for Collier. See *Davis v. Waller*, 44 F.4th 1305, 1315 (11th Cir. 2022); *Carr v. Tatangelo*, 338 F.3d 1259, 1269, n,19 (11th Cir. 2003) Thus, the District Court's reliance on *Vaughn*, respectfully, was misplaced, and this Court should, based on the undisputed evidence and lack of clearly established law, reverse the District Court and find that Collier is entitled to qualified immunity.

The District Court also relied on *Tennessee v. Garner*, 471 U.S. 1 (1985) to justify denying Collier qualified immunity. However, *Garner* would not have put Collier on notice that his actions on November 14, 2020 were not reasonable under the facts and circumstances that he faced in a moment that was tense and rapidly evolving. *Garner* was focused more on the Tennessee statute that allowed for

41

officers to use deadly force to stop any fleeing felon and the Supreme Court ultimately rationalized that under the circumstances the officer faced, deadly force was not reasonable, i.e. the suspect was unarmed and posed no physical danger to himself or others. *Id*. at 21. The Supreme Court still took time to acknowledge that the individual defendants in *Garner* had been dismissed as parties and the only possible liability that remained was against the department and the city pursuant to *Monell*. *Id*. at 22. While *Garner* set the stage for seizures being subjected to the reasonableness requirement of the Fourth Amendment, the Supreme Court was careful to note that specific facts in each situation where deadly force was utilized mattered.

Like the other cases relied upon by the District Court, the facts of *Garner* were so different from those that Collier faced that *Garner* could not have reasonably put Collier on notice that his actions on the night of November 14, 2020 would subject him to liability when he used deadly force to protect himself and Deputy Hart from Settle's threatening act of starting the truck and putting it into gear after refusing lawful commands to get out of the truck, especially when this Court takes into consideration that the entire interaction lasted less than one minute.

While Plaintiff relied on *Underwood*, that case, like *Tillis*, was not decided until 2021, which was *after* the events in this case. Therefore, case law was not

clearly established on November 14, 2020, such that Collier would have known under the facts and circumstances that he faced that his actions were unreasonable.

If Collier had the benefit of *Underwood* and *Tillis*, those cases would not have put him on notice that his actions would be unreasonable or unconstitutional. In *Underwood*, this Court held that in the light most favorable to the plaintiff, it was not until after the officers began shooting that the plaintiff accelerated; thus, the court held that a reasonable jury could find that the plaintiff did not pose a serious threat to the officers. However, even if the facts, taken in the light most favorable to the plaintiff, could substantiate a constitutional violation, the court found that the officers were still entitled to qualified immunity based on established case law. *Underwood v. City of Bessemer*, 11 F.4th 1317, 1332 (11th Cir. 2021). Additionally, this Court in *Underwood*, which was decided after November 14, 2020, specifically analyzed both *Morton* and *Vaughn* and ultimately found those cases did not clearly establish the law. Therefore, *Morton* and *Vaughn* could not have clearly established the law such that Collier would have been on notice on November 14, 2020 that his actions would be unconstitutional.

In *Tillis*, this Court held an officer was entitled to qualified immunity, not only to the first many rounds that were fired, but also to the second many rounds that were fired, even though the vehicle was not travelling directly at the officer who fired the shots. *Tillis on behalf of Wuenschel v. Brown*, 12 F.4th 1291, 1299 (11th Cir. 2021).

43

Importantly, the dissent in *Tillis* argued that the "supposition that [the Pontiac] could suddenly have changed direction and hit [the officer] is contrary to the laws of physics." *Id., Dissenting Op*. at 1308. However, this Court concluded that deadly force is justified where the officer has to "make a split-second decision of whether he could escape before he got crushed," and that even if the Pontiac "could not possibly have swerved to hit [the officer]" based on its turning radius and its angle and distance to the officer, the relevant question is whether it was reasonable for [the officer] to fear otherwise the moment the Pontiac started backing up." *Id*. at 1299. "Perspective …is crucial to the analysis," and "the only perspective that counts is that of a reasonable officer on the scene at the time the events unfolded." *Jean-Baptiste v. Gutierrez,* 627 F.3d 816, 821 (11th Cir. 2010). Like Collier, the officer in *Tillis* had a split second to react and "certainly did not have time to calculate angles and trajectories to determine whether he was a few feet outside of harm's way. *Tillis,* at 1299.

Settle started the truck after Collier gave lawful commands for him and Whitehead to unlock the doors and exit the vehicle. It was dark, and Collier was trapped by the truck, the enclosed porch, the house, and debris. These circumstances created a reasonable and well-founded fear in Collier that his and Hart's lives were in danger because Settle's action could be interpreted by a reasonable officer as a threat to use his car as a deadly weapon in an attempt to escape or avoid capture.

44

The District Court mistakenly determined that "in the context of a suspect using a vehicle, it appears that this principle extends only to situations where the suspect's prior behavior or use of the vehicle gave an officer reason to believe that the vehicle had become a deadly weapon." [District Court's Opinion, pp. 13-14]. That goes to the heart of the argument that the law was not clearly established, because the District Court failed to consider Settle's actions after being given lawful commands, which would create fear in a reasonable officer facing the same set of circumstances that Settle intended to use the truck as a deadly weapon, which could (and did) put Collier's life in danger. The fact that there are no cases which address the same or even substantially similar set of circumstances that Collier faced means, in this situation, as in *Underwood*, that the law was not clearly established, and the District Court erred when it denied Collier's Motion for Summary Judgment.

"[A] clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates the right." *Gregory v. Miami Dade, Florida*, 719 Fed. Appx. 859, 868 (11th Cir. 2017) (quoting *Mullenix v. Luna*, 577 U.S. 7, 136 S. Ct. 305, 308 (2015)). Thus, the lawfulness of the conduct must be apparent from pre-existing law. *Coffin v. Brandau*, 642 F.3d 999, 1013 (11th Cir. 2011) (en banc). This also means, "whether the officer had fair notice that [his] conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct." *Kisela v. Hughes*, 584 U.S. 100, 104

45

(2018) (citing *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004)). The District Court incorrectly concluded that the cases relied on by Collier were substantially different while accepting that the cases relied on by the Plaintiff/Appellee were substantially similar enough to be controlling. However, Collier submits there are no materially similar cases that have been decided by this Court, the Supreme Court, or the Supreme Court of Florida that would have put him on notice that his actions on November 14, 2020, were unconstitutional under the circumstances.

In *Terrell v. Smith*, 668 F.3d 1244, 1251, 1254-55 (11th Cir. 2012), the Court concluded, taking the facts in the light most favorable to the plaintiffs, that the suspect was instructed to stop the car, but instead of complying with the officer's orders, the suspect attempted to turn the car in a manner that caused it to strike the officer. The Court opined that "any misstep by [the officer] could have caused him to fall and be crushed under the weight of the moving vehicle." Additionally, the Court concluded that the officer was forced to make a split-second decision as to whether the use of lethal force was necessary, and "[e]ven if in hindsight the facts show that [the officer] perhaps could have escaped unharmed, an objectively reasonable law enforcement officer could well have perceived that the moving vehicle was being used as a deadly weapon, especially after the driver had been repeatedly ordered to stop." *Id*. at 1255.

46

If anything, the numerous cases, based on specific facts and circumstances, none of which are directly on point, establish that there is no clearly established law. Therefore, this Court should reverse the District Court and find that Collier is entitled to qualified immunity and summary judgment.

## II.    Defendant/Appellant Collier is entitled to State-Agent Immunity pursuant to Florida Statute §768.28(9).

Pursuant to Florida Statute §768.28(9), deputies are entitled to state-agent immunity on individual capacity state law tort claims when they are acting within the course and scope of their discretionary authority and without bad faith, malicious purpose, or in a manner exhibiting wanton and willful disregard of human rights, safety, or property.

Plaintiff brings a battery (wrongful death) claim against Collier in his individual capacity, under Florida law, claiming that Collier's conduct was intentional, willful, and wanton.  F.S. §768.28(9)(a) specifically provides that "[n]o officer, employee, or agent of the state or any of its subdivisions shall be held personally liable in tort or named as a party defendant in any action for any injury or damage suffered as a result of any act, event, or omission of action in the scope of her or his employment or function, unless such officer, employee, or agent, acted in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property."

47

A plaintiff's allegations of excessive force must first overcome the presumption of good faith afforded to an officer's use of force, such that an officer is liable for damages only if the force used is found to be clearly excessive. *City of Miami v. Sanders*, 672 So.2d 46, 47 (Fla. 3d DCA 1996). Excessive force claims by their very nature require intentional conduct, and thus lie, if at all, in the realm of battery. *Id*. at 48. Collier is entitled to statutory immunity pursuant to Florida Statute §768.28(9) unless he acted in bad faith, with malicious purpose, or with willful and wanton disregard of human rights, safety, or property. *Alexander v. Sheriff of Indian River County, Florida,* 724 Fed. Appx. 744, 749 (11th Cir. 2018). Such acts are committed beyond the scope of one's duties as a law enforcement officer. *McGhee v. Volusia County*, 679 So. 2d 729, 730 (Fla. 1996)

In the context of §768.28(9), F.S., "bad faith" has been equated with the actual malice standard, while "malicious purpose" has been interpreted as meaning the conduct was committed with "ill will, hatred, spite [or] an evil intent." *Peterson v. Pollack*, 290 So. 3d 102, 109 (Fla. 4th DCA 2020) "Wanton and willful disregard of human rights or safety" has been interpreted as "conduct much more reprehensible and unacceptable than mere intentional conduct," *Richardson v. City of Pompano Beach*, 511 So.2d 1121, 1123 (Fla. 4th DCA 1987), and conduct that is worse than gross negligence. *Sierra v. Associated Marine Insts., Inc*., 850 So.2d 582, 593 (Fla. 2d DCA 2003).

48

There is no record evidence that Collier went to 2242 Handy Road with any intent other than to serve arrest warrants on Settle and Whitehead. While Collier had previously interacted with Settle's son and was aware of Settle's history of running from the police, he had never personally interacted with Settle. Collier was performing his duties as a Deputy and was attempting to arrest Settle and Whitehead. After a brief interaction, where Collier and Hart both gave Settle and Whitehead commands to exit the vehicle, Settle instead put the keys in the ignition, started the truck, and put it in gear.[7] It is undisputed that after being given lawful commands to exit the vehicle, (1) Settle turned the vehicle on, (2) the vehicle, upon being "cranked up" was so loud that Whitehead described it like a gunshot, (3) the vehicle was placed in gear, (4) at the time this incident occurred, Collier was only a matter of feet from the vehicle and had fallen to the ground, (5) Collier was trapped between the truck, the house, and the enclosed porch, and surrounded by a lawn mower, an AC unit, a chair, and various other debris on the ground all around him, (6) Collier believed he and Hart were in danger from the truck, (7) Hart was on the other side of the truck and objectively believed his life and Collier's life were in danger, (8) there were mere seconds between Settle starting the truck and putting it in gear and Collier firing his weapon, and (9) Settle was located behind the driver's wheel at all relevant times. Therefore, it was reasonable for Collier to believe, given the totality

---

[7] Whether the truck moved or not is immaterial to the Court's analysis.

49

of the circumstances and the perspective of a reasonable officer facing the same set of facts, that Settle's actions caused Collier's life to be in danger, and Collier need not wait until he was struck or pulled under the truck to take action.

In addition to being entitled to state-agent immunity under §768.28(9), F.S., Collier is entitled to immunity under §776.032, F.S. Florida law provides for self-defense immunity to civil claims based on the use of force. *See* §776.032(1), F.S. ("A person who uses or threatens to use force as permitted in §776.012… is justified in such conduct and is immune from criminal prosecution and civil action for the use of force or threatened use of force"); *see also Penley,* 605 F.3d at 843. Given the totality of circumstances, Collier, based on Settle's actions, was justified in his use of force against Settle pursuant to the provisions of §776.012, F.S.; therefore, he is entitled to self-defense immunity from civil actions as set forth in §776.032, F.S.

This Court should reverse the District Court and find that Collier is entitled to state-agent immunity based on the specific set of facts and circumstances he faced on the night of November 14, 2020.

## **CONCLUSION**

As established, on the night of November 14, 2020, Collier and Hart arrived at Settle's residence to serve valid arrest warrants on Settle and Whitehead. Settle and Whitehead were hiding in Settle's truck attempting to conceal themselves from the Deputies. When located, rather than comply with lawful commands, Settle

started the truck and put it in gear. Collier was located near the driver-side window, trapped between the truck, the house, and the enclosed porch, and surrounded by debris. The truck made a loud noise when Settle started it because it had "the biggest Corvette engine" and "pipes." Collier tripped over something in the yard and fell when attempting to back away from the truck and in fear for his safety, after regaining his footing and with nowhere to go to get away from Settle's truck, he fired two shots at Settle because he reasonably feared the truck could be used as a deadly weapon against him or Hart, who was somewhere on the passenger side of the vehicle yelling.

There is no case law that clearly establishes that Collier would violate Settle's constitutional rights by using deadly force to prevent Settle from running over him or Hart. Furthermore, a reasonable officer in those circumstances could certainly decide his life was in danger based on Settle's actions of starting the truck and putting it in gear after being lawfully commanded to unlock the doors and exit the vehicle. A suspect does not have to be actively driving the vehicle for it to be considered a deadly weapon, because the mere possibility that he could drive it is enough for a reasonable officer to act to protect himself and others. Even if this Court were to conclude that Collier's actions amounted to excessive force, the law was not clearly established at the time and Collier is entitled to qualified immunity. Collier is also entitled to state-agent immunity.

Therefore, this Court should reverse the District Court's ruling and find that Collier is entitled to qualified immunity, state-agent immunity, and summary judgment as a matter of law.

> WARNER LAW FIRM, P.A.
> */s/ Alyssa M. Yarbrough*
> ALYSSA M. YARBROUGH
> Florida Bar No.: 0103407
> JENNIFER HAWKINS
> Florida Bar No. 017694
> TIMOTHY M. WARNER
> Florida Bar No.: 0642363
> 501 W. 11th Street, Suite A
> Panama City, Florida 32401
> Telephone No.: (850) 784-7772
> Fax No.: (850) 784-7756
> pleadings@warnerlaw.us
> *Counsel for Defendant/Appellant*

## Certificate of Compliance with Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

### Type Volume

Pursuant to FRAP 32(a)(7)(B), I hereby certify that this brief, excluding the parts of the document exempted by FRAP 32(f), contains 12,767 words.

### Typeface and Type-Style

This document complies with the typeface requirements of FRAP 32(a)(5) and the type-style requirements of FRAP 32(a)(6) in that it uses Times New Roman 14-point font.

> */s/ Alyssa M. Yarbrough*
> ALYSSA M. YARBROUGH
> Florida Bar No.: 0103407

52

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 9th day of October, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to the following: Galen M. Novotny, gnovotny@esclaw.com, 30 S. Spring Street, Pensacola, FL 32502; and Eric D. Stevenson, *eric@stevensonklotz.com*, 510 E. Zaragoza St., Pensacola, FL 32502.

WARNER LAW FIRM, P.A.

*/s/ Alyssa M. Yarbrough*
ALYSSA M. YARBROUGH
Florida Bar No.: 0103407

53