FOR PUBLICATION

In the

United States Court of Appeals

For the Eleventh Circuit

————————————————

No. 24-12436

————————————————

KIMBERLEY DIANE SETTLE,

   A Personal Representative for the Estate of Jacob
   Joseph Settle Sr,

                                             *Plaintiff-Appellee,*

*versus*

DAVID COLLIER,

                                             *Defendant-Appellant.*

————————————————

Appeal from the United States District Court
for the Northern District of Florida
D.C. Docket No. 3:22-cv-22688-TKW-HTC

————————————————

Before WILLIAM PRYOR, Chief Judge, and BRANCH and ABUDU, Circuit Judges.

WILLIAM PRYOR, CHIEF JUDGE:

     This appeal requires us to decide whether Officer David Collier is entitled to immunity from a suit involving the death of Jacob

Settle. On the evening of November 14, 2020, Collier and his part-
ner officer went to Settle's house to execute arrest warrants for him
and his wife. Settle was in his truck when Collier arrived and re-
fused to leave the truck when Collier demanded that he do so.
Within seconds, the situation escalated as Collier threatened to
break open the windows, and Settle then started the engine of the
truck and placed the transmission into a gear. Collier was in a tight
space in between the truck and the house and feared the truck
would hit him and his partner, so he fired his gun into the truck.
Settle died on the scene. His estate's representative sued Collier for
excessive force in violation of the Fourth Amendment and for bat-
tery under Florida law. After Collier invoked qualified immunity
and state immunity, the district court denied Collier's motion for
summary judgment. We reverse and remand with instructions to
grant summary judgment in favor of Collier.

## I. BACKGROUND

In this appeal of a denial of summary judgment based on
qualified immunity, we recount the events viewing the evidence in
the light most favorable to the estate as nonmovant. *See Baxter v.
Santiago-Miranda*, 121 F.4th 873, 878 (11th Cir. 2024).

On the evening of November 14, 2020, Escambia County of-
ficers David Collier and Raymond Hart arrived at 2242 Handy
Road to execute arrest warrants for Jacob Settle and his wife,
Sophronia Whitehead. Settle had active arrest warrants for driving
while his license was suspended, and Whitehead had active arrest
warrants for failure to appear, destroying evidence, parole

violations, and driving while her license was suspended. Officers Hart and Collier had never encountered Settle before that night. Although Collier stated that he was aware that Settle had a "narcotics violation history," he had no way of knowing if Settle was under the influence of narcotics at the time.

Whitehead and Settle had visited a friend until the early morning hours of November 14, so they slept until around 8:30 p.m. When they awakened, they decided to drive to another friend's house in Settle's truck. Because the front door was boarded up, Settle left through the back door, which Whitehead then locked, and she exited through the bedroom window.

After arriving, the officers made their way to the backyard where the truck was parked. Collier saw the truck parked "parallel" with the porch, the driver's side facing it. The front end of the truck faced the house and was parked "almost up against" it. There was also an air conditioning unit "sitting right up against" the porch, roughly perpendicular to the truck's back wheel. The backyard was "pitch black" that night because there were no working porch or backyard lights. The officers' flashlights were "the only light[s]" in the backyard. The backyard was also filled with "debris and trash in the yard stacked up against the porch."

As the officers approached the truck, Whitehead and Settle saw their flashlights "come around the side of the house." Whitehead entered the passenger's seat and Settle entered the driver's seat. Whitehead and Settle "duck[ed] down in the truck." Whitehead said that they did not know the officers were police "until they

c[a]me around" to the truck. Collier "got right up on the driver's side" with his flashlight and saw both "slumped over" inside. Hart went up to the passenger's side. Neither Whitehead nor Settle exited the truck even after realizing the presence of police officers. But Whitehead sat up when she realized it.

Worried that Settle might be unconscious, Collier "attempted to open up the door," but it was locked. Settle then sat up straight and looked alert. Collier and Hart announced that they were from the sheriff's office and asked Settle, by name, to exit the vehicle. After Settle did not exit the vehicle, Collier announced he was there to serve an arrest warrant and yelled, "Open your doors. Unlock your doors or we're going to bust your windows out." Settle attempted to deceive the officers by telling them that they were trying to arrest the wrong person. His flashlight still shining into the car, Collier then saw Settle "dig and reach around with his hands in the center console" and heard what he thought was the jingle of keys. So he "tried beating on the driver's side window, trying to break the glass and enter the vehicle to get him out."

Settle started the truck's engine. Whitehead, Hart, and Collier all saw Settle then put the transmission into gear. Collier dropped his flashlight and pushed himself away from the truck. Whitehead testified that the "truck never moved an inch" after Settle put it into gear, speculating that he must have only put it in neutral.

Within a few seconds of Settle putting the truck into gear, Collier fired his gun. At the time of firing, Collier was "eight to

[ten] feet" away from the truck. Both bullets went through the driver's side door window, not through the front window. Whitehead stated that she "heard two somethings" after Settle put the transmission in gear when she was interviewed in December 2022 by criminal investigators. But at her July 2023 deposition, Whitehead said that she "didn't hear no gunshots," because "the truck has got pipes on it." Instead, she testified that she became aware of the gunshots because her "leg was burning down the side . . . from gunpowder." According to Whitehead, the gunshots and the starting of the engine must have been nearly simultaneous.

The two shots struck Settle. Collier opened the truck door and started rendering aid to Settle by applying pressure to his two wounds—both in his arm / shoulder area. Settle stopped breathing, so Collier tried to resuscitate him. But Settle died. Settle's toxicology report showed both methamphetamine and THC carboxy in his blood at the time of death.

On November 9, 2022, the personal representative of Settle's estate filed this suit in the district court against Collier, Hart, and the sheriff. The district court dismissed the claims against Hart and the sheriff, which left two claims against Collier: one claim for excessive force in violation of the Fourth Amendment, 42 U.S.C. § 1983, and a claim of battery under Florida law.

During discovery, the estate produced one expert, Kelly Timms, a forensic services technician. In her deposition, Timms disputed that Collier was at risk of being struck by the truck when he fired the shots that killed Settle. She opined that Collier was not

standing directly in front of the truck when he fired the deadly shots, but was instead standing in line with the metal part of the truck between the front windshield and the front side doors—otherwise known as the "A-pillar."

After Collier moved for summary judgment based on qualified immunity and state-agent immunity, the district court denied his motion. The district court ruled that a "reasonable jury could find that [Collier] violated Mr. Settle's constitutional right to be free from excessive force when he shot into a non-moving truck that did not pose a risk to [Collier] or others." It denied qualified immunity because it was "clearly established since at least 2013 that when a driver does not use or does not threaten to use his car as a weapon, an officer may not use deadly force against him." And it ruled that Collier was not entitled to state immunity from the battery claim because a "reasonable jury could find that [Collier] acted with wanton and willful disregard" for Settle's safety and that Collier "did not reasonably believe that it was necessary to use deadly force because Mr. Settle did not use the truck against [Collier] in a threatening way."

## II.  STANDARDS OF REVIEW

We "review a denial of qualified immunity *de novo* and, on a motion for summary judgment, view the evidence in the light most favorable to the nonmoving party." *Nelson v. Tompkins*, 89 F.4th 1289, 1295 (11th Cir. 2024). We review *de novo* whether an officer is entitled to summary judgment based on state law immunity. *English v. City of Gainesville*, 75 F.4th 1151, 1155 (11th Cir. 2023).

## III. DISCUSSION

We divide our discussion into two parts. First, we explain that Collier is entitled to qualified immunity because he did not use excessive force. Second, we explain that Collier is entitled to state-agent immunity from the claim of battery.

### A. *Collier Did Not Use Excessive Force in Violation of the Fourth Amendment.*

When officers raise the defense of qualified immunity, they have "the burden to establish that they were acting within their discretionary authority." *Ingram v. Kubik*, 30 F.4th 1241, 1250 (11th Cir. 2022). "If the officers satisfy that burden, the burden then shifts to the plaintiff to establish that the officers violated a constitutional right that was clearly established at the time of the alleged violation." *Id*. We may review whether there was a violation or whether the violation was clearly established in either order. *Id*. In this appeal, we start and end with whether Collier violated Settle's constitutional rights by using excessive force. The estate does not dispute that Collier was acting "pursuant to his discretionary authority" during the incident. So the burden shifted to the estate to prove that Collier violated Settle's clearly established constitutional rights.

An "excessive force claim [that] arises in the context of an arrest . . . is most properly characterized as one invoking the protections of the Fourth Amendment, which guarantees citizens the right 'to be secure in their persons . . . against unreasonable . . . seizures.'" *Graham v. Connor*, 490 U.S. 386, 394 (1989) (quoting U.S.

CONST. amend. IV). As the text of the Fourth Amendment suggests, excessive force claims are governed by an "'objective reasonableness' standard." *Id.* at 388. In reviewing the reasonableness of an officer's use of force, "we look at the fact pattern from the perspective of a reasonable officer on the scene with knowledge of the attendant circumstances and facts, and balance the risk of bodily harm to the suspect against the gravity of the threat the officer sought to eliminate." *McCullough v. Antolini*, 559 F.3d 1201, 1206 (11th Cir. 2009). "Our inquiry does not employ the 20/20 vision of hindsight." *Baxter*, 121 F.4th at 888 (citation and internal quotation marks omitted).

The use of *deadly* force is reasonable when an "officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." *Tennessee v. Garner*, 471 U.S. 1, 11 (1985). So "if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given." *Id.* at 11–12. "This rule covers situations in which (1) an officer believed his life was in danger because a suspect used a vehicle as a weapon against the officer or (2) the suspect's use of the vehicle otherwise presented an immediate threat of serious physical harm." *Baxter*, 121 F.4th at 888. This Court has "[c]onsistently . . . upheld an officer's use of deadly force" under this framework. *Id.* And the Fourth Amendment does not "require officers in a tense and dangerous situation to wait until the moment a suspect uses a

deadly weapon to act to stop the suspect." *Long v. Slaton*, 508 F.3d 576, 581 (11th Cir. 2007).

The parties dispute whether Collier could have reasonably believed that Settle's vehicle presented an immediate threat of physical harm warranting the use of deadly force. Collier argues that even under the estate's version of events, the circumstances were "tense, rapidly evolving, and not within [his] complete control" such that he had an objectively reasonable belief that deadly force was necessary to protect his and Hart's lives. Settle's estate argues that "the truck never moved," so the truck could not have been "used or threatened to be used in a way that indicated it had become a deadly weapon." We agree with Collier.

The estate's argument ignores that, under the circumstances, Settle needed not move the car for his actions to be reasonably perceived as threatening. The estate admits that Settle "started the truck and moved the gear shift." Collier saw Settle put the truck into gear. And Whitehead said that Settle put the car into gear before Collier fired. So, even viewing the evidence in the light most favorable to the estate, there was some amount of time between Settle starting the truck and Collier firing the shots. In that short time, Collier recognized Settle's intent to drive the truck and so convert it into a deadly weapon.

Two of our decisions are instructive. First, *Long v. Slaton* involved a mentally unstable man who stole a police vehicle and tried to back it out of a driveway. 508 F.3d at 578–79. The officer at the scene knew of the man's condition, pointed his pistol at the man,

and warned him to comply or else he would shoot. *Id*. The man put the car in reverse and backed down the driveway; the officer stepped in the middle of the driveway (facing the front of the car) and fired three shots that killed the man. *Id*. While the car had not yet become a "deadly weapon" at the time of the shooting, the plaintiff's "unstable frame of mind, energetic evasion of the deputy's physical control, . . . criminal act of stealing a police cruiser, and [his] starting to drive . . . gave the deputy reason to believe that [he] was dangerous." *Id*. at 581–82. (footnote omitted). And in *Pace v. Capobianco*, this Court held that an officer who shot a man *after* a high-speed chase did not violate the Fourth Amendment "[e]ven when" the man's "car was stopped," he "did not try to run over the deputies[,] . . . [and] did not aim the car at the deputies." 283 F.3d 1275, 1277, 1282 (11th Cir. 2002). The Court reached that conclusion because "[b]y the time of the shooting, [the man] had used the automobile in a manner to give reasonable policemen probable cause to believe that it had become a deadly weapon." *Id*. at 1282. And the man never "left his automobile or even turned the engine off," establishing that he was still "armed." *Id*. at 1281–82.

Even if the truck never moved, Collier could reasonably perceive that Settle's vehicle was a deadly weapon. He reasonably interpreted Settle's starting the engine and putting it into gear as escalatory. Common sense would suggest that Settle's next step would be to drive—not to remain stationary. Settle had already resisted arrest; by starting the truck engine and putting it into gear, Collier reasonably believed that Settle intended to escape in reckless disregard of the officers' safety or to evade arrest by injuring

them. By starting the engine and putting the transmission into gear, Settle converted his truck into a "deadly weapon with which [he] was armed." *Id*. at 1282. And because Collier had probable cause to believe Settle intended to drive the truck dangerously, he was not "require[d] . . . to wait [to fire] until the moment" that Settle drove it. *Long*, 508 F.3d at 581.

We reject the estate's attempt to create a categorical rule that officers cannot reasonably perceive that a vehicle has been converted into a deadly weapon either until the vehicle moves or unless the suspect's behavior before the incident established that he was dangerous. The estate admits that "this Court has [held] that even if a vehicle did not move and an officer was not in its path, the use of deadly force could be reasonable." Yet it argues that this "principle . . . extends only to situations where the suspect's prior behavior or use of the vehicle gave an officer reason to believe that the vehicle had become a deadly weapon." But our precedents establish no bright-line rule. After all, "[t]he constitutional test for excessive force is necessarily fact specific," *McCullough*, 559 F.3d at 1206, and "not capable of precise definition or mechanical application," *Long*, 508 F.3d at 580 (citation and internal quotation marks omitted).

The estate makes much of one surface-level similarity between this appeal and *Morton v. Kirkwood*, a decision where we discerned a constitutional violation. 707 F.3d 1276 (11th Cir. 2013). In *Morton* too the vehicle was "stationary" when the officer fired at its driver. *Id*. at 1279–80, 1282. The plaintiff was sitting in his car at a

park when he saw a police officer walk into the park. *Id*. at 1279. He then attempted to "coast" out of the park, never seeing anyone in front of his car. *Id*. At that point, the plaintiff heard an officer shout, so he "shifted his car to park and raised his hands." *Id*. at 1279–80. The officer "nonetheless shot at the car." *Id*. at 1280. We held that, based on those facts, an officer could not reasonably perceive an immediate threat to his safety. *Id*. at 1281–82.  The fact that the vehicle in *Morton* was stationary is of little importance. In *Morton*, the vehicle was stationary because the driver complied with the officer's request to stop the vehicle. *Id*. at 1279–80. In this appeal, the truck was stationary from the start of the encounter; Settle did not make it stationary at the command of the officer. Indeed, Settle refused to comply with Collier's lawful order to exit the vehicle, unlike the plaintiff in *Morton*, who alleged that he promptly complied with the officer's orders. *Id*. The plaintiff in Morton *deescalated*, unlike Settle who escalated the situation by starting the truck and putting the transmission into gear.

The estate insists that Collier was unreasonable in firing because he "was not in the path of the truck" and was about eight feet away when he fired. This argument answers the wrong question. Reasonableness hinges on the perspective of the officer, so the more apt question is whether Collier could have *reasonably perceived* that he was in the path of the vehicle and that his safety was in danger. *See Tillis v. Brown*, 12 F.4th 1291, 1299 (11th Cir. 2021). And we do not impose on officers "the benefit of hindsight." *Baxter*, 121 F.4th at 890. When officers must make split-second judgments, we accept that they "d[o] not have time to calculate angles and

trajectories to determine whether [they are] a few feet outside of harm's way." *Tillis*, 12 F.4th at 1299.

Two precedents are instructive. In *Robinson v. Arrugueta*, we declined to hold an officer to the benefit of hindsight that he "perhaps could have escaped unharmed." 415 F.3d 1252, 1256 (11th Cir. 2005). There, the decedent accelerated to just one to two miles per hour toward the officer, but the officer was standing four feet away from the front of the vehicle and was sandwiched between the decedent's vehicle and another. *Id.* at 1254, 1256. And *Tillis* involved a high-speed chase that ended with a crash into some bushes. 12 F.4th at 1295. The officer pulled behind the vehicle and stepped out of his car to make the arrest. *Id.* As he stepped out, the vehicle's "reverse lights turned on" and the officer shot into the vehicle as it drove past him. *Id.*  We held that the officer "had no way of knowing whether [the vehicle] would continue in a straight line or swerve toward him," and he did not have time to calculate whether he was in harm's way. *Id.* at 1299. "[O]n foot next to [the] vehicle," the officer was "exposed to danger" which justified firing at the suspect. *Id.*

Collier feared for his life when Settle put the truck into gear. Collier could reasonably fear that Settle's next move was to drive it. Like the officer in *Robinson*, Collier was in a "narrow space" between the car and the porch—even if more than four feet away. 415 F.4th at 1256. Had Collier tried to escape by rushing directly away from the house toward the back of the truck, the air conditioning unit and debris would have obstructed his path. And he

reasonably could have feared being struck if the vehicle went in reverse. Moving the other way would have required him to step in front of the vehicle which had been put into gear. Like the officer in *Tillis*, he also "had no waying of knowing" what Settle would do next, especially considering that Settle was actively resisting arrest. *See* 12 F.4th at 1299. And he was standing "on foot next to" Settle's truck, exposing him to danger from the truck's movements. *See id.* Collier had little-to-no visibility in the "pitch black" backyard. And Collier no longer had his flashlight in hand. So even if there were a clear path of escape, Collier would not have been able to see it. We cannot hold Collier to the benefit of hindsight by requiring him to have "calculate[d] angles and trajectories" of the truck's potential paths or for an escape attempt. *Id.*

Settle's estate suggests that Collier was not justified in firing because he had no reason to believe that Settle was violent or dangerous before the encounter. True, "the severity of the crime prompting [the encounter] can carry weight" in the reasonableness analysis. *Barnes v. Felix*, 145 S. Ct. 1353, 1358 (2025) (citation and internal quotation marks omitted). But in "circumstances that are tense, uncertain, and rapidly evolving," we must make "allowance for the fact that police officers are often forced to make split-second judgments." *Graham*, 490 U.S. at 396–97. Sometimes, an officer does not have time to reflect and consider why the encounter was initiated—whether it was a routine *Terry* stop or a high-speed chase.

We have held that an officer acted reasonably in using deadly force by shooting into a vehicle during a tense situation even when the officer did not have reason to think the driver had committed violent crimes. For example, in *Baxter*, this Court held that an officer did not violate the Fourth Amendment when he fired shots into a vehicle being driven by a person suspected of simple car theft. 121 F.4th at 878–91. And in *Robinson,* this Court held that an officer did not violate the Fourth Amendment when he fired shots into a vehicle being driven by a person suspected of dealing heroin. 415 F.3d at 1253, 1256.

The estate faults Collier for neither giving a warning that he was about to fire nor "display[ing] his weapon" before firing the shots. "Officers are required to give a warning before using deadly force if a warning is feasible. The critical inquiry is feasibility." *Davis v. Waller*, 44 F.4th 1305, 1315 (11th Cir. 2022). The feasibility requirement is not an "inflexible rule that, in order to avoid civil liability, an officer must always warn his suspect before firing—particularly where . . . such a warning might easily have cost the officer his life." *Id.* (citation and internal quotation marks omitted). Settle's rapid escalation and Collier's proximity to the truck put Collier in immediate danger, so he was not required to issue a warning before firing.

The estate's reliance on *Vaughan v. Cox* is unavailing. 343 F.3d 1323 (11th Cir. 2003). In *Vaughan*, an officer "traveled alongside" a fleeing stolen vehicle, which had struck a police cruiser, on an interstate highway for 30 to 45 seconds before firing into the

vehicle. *Id.* at 1326–27, 1331. We considered that ample "time and opportunity to warn" the vehicle's driver before firing. *Id* at 1331. Here, in contrast, the encounter escalated in the seconds it took Settle to turn on the truck and put it into gear, giving Collier little time or opportunity to issue a warning.

The district court relied on *Underwood v. City of Bessemer*, 11 F.4th 1317 (11th Cir. 2021), to hold that Collier could have warned Settle before firing. In *Underwood*, an officer walked in front of a vehicle as it "coast[ed]" slowly toward the officer "as if to stop," and the officer began shooting when the vehicle was roughly eight feet away. 11 F.4th at 1322, 1331. True, in *Underwood* and here, the officer was eight feet away at the time he fired—and at that distance, a warning is in fact more feasible. But the driver in *Underwood* was slowing down "as if to stop," unlike Settle who put the truck in gear as if to drive. In the light of the proximity of the truck to Collier, Collier's lack of visibility, and Settle's escalatory actions, Collier could forego a warning. A delay could have put his or Hart's life in danger. *See Waller*, 44 F.4th at 1315.

### B. *Collier is Entitled to State Statutory Immunity from the Estate's Battery Claim.*

Florida's self-defense immunity statute provides that a "person who uses or threatens to use force as permitted in [section] 776.012 . . . is justified in such conduct and is immune from . . . civil action for the use or threatened use of such force." FLA. STAT. § 776.032(1). Section 776.012 also provides that a person who "reasonably believes that using or threatening to use such force is

necessary to prevent imminent death or great bodily harm to himself . . . or another" may use deadly force, and that there is no "duty to retreat" before using or threatening to use such force. *Id.* § 776.012(2). We have ruled that section 776.012 is at least co-extensive with the Fourth Amendment standard for the use of deadly force. *See Penley v. Eslinger*, 605 F.3d 843, 855–56 (11th Cir. 2010). Because Collier's use of deadly force was not excessive in violation of the Fourth Amendment, Collier was also entitled to immunity from the estate's claim of battery.

## IV. CONCLUSION

We **REVERSE** and **REMAND** with instructions to enter judgment for Collier.

ABUDU, Circuit Judge, Dissenting:

The record in this case presents conflicting evidence regarding the material fact of whether Deputy Sheriff David Collier was near or in the path of Jacob Settle, Sr.'s truck, as well as if and how Settle's truck was moving to justify Collier shooting into it and killing Settle. The district court correctly concluded that these factual disputes, when taken in the light most favorable to Settle's estate (the "Plaintiff"), could allow a reasonable jury to find that Settle's vehicle did not present an immediate threat of physical harm, thereby making Collier's use of deadly force unreasonable.

We review a district court's grant of summary judgment *de novo*, *Christmas v. Harris County*, 51 F.4th 1348, 1353 (11th Cir. 2022), viewing the facts and drawing all reasonable inferences in the light most favorable to the non-moving party, *Sconiers v. Lockhart*, 946 F.3d 1256, 1262 (11th Cir. 2020). Summary judgment is appropriate when the record contains no genuine issues of material fact such that the court may grant judgment as a matter of law in favor of the moving party. *Marbury v. Warden*, 936 F.3d 1227, 1232 (11th Cir. 2019). The issue is only material if it could ultimately change the outcome of litigation. *Terrell v. Sec'y Dep't of Veterans Affs*, 98 F.4th 1343, 1351 (11th Cir. 2024). It is only genuine if it could lead the reasonable factfinder to rule in favor of the nonmovant. *James River Ins. Co. v. Ultratec Special Effects Inc.*, 22 F.4th 1246, 1251 (11th Cir. 2022). On *de novo* review, the district court was correct in concluding that Collier did not meet his burden.

### A.    There Exist Genuine Issues of Material Fact

On the night of November 14, 2020, Deputies David Collier and Raymond Hart went to the home of Raymond Settle and Sophronia Whitehead to execute arrest warrants for nonviolent crimes.  Both deputies explained that they approached the front door to no avail, so they proceeded to the backyard to continue their search.  Settle's truck was parked in the backyard near the porch and facing his house.  Whitehead and Settle had gotten into the truck just as the deputies entered the backyard to continue their search.  The parties dispute what happened next.

In Collier's version of events, the backyard was "very dark," so he and Hart conducted their search using flashlights to illuminate their path and avoid being seen by Whitehead and Settle.  Collier suspected that they were both concerned about being arrested because they had outstanding warrants and feared going to jail.  He, therefore, initially thought that the two were hiding from the officers.

Collier then explained that he approached the truck to ask Settle and Whitehead to get out of it, but the two refused.  He then tried to break through the truck's driver's side window to remove Whitehead and Settle from the vehicle.  As he did so, Settle reportedly started the truck and put it in reverse, which scared Collier and caused him to step back from the truck.  When Collier stepped back from the truck, he tripped over something in the yard, which caused him to fall on the ground.  He said that he then regained his

footing and drew his weapon before firing two shots into the driver's side window, which ultimately killed Settle.

In the days following the shooting, Collier recounted that the truck was "coming at [him]" as if it were approaching him head on. He explained that he was "in [a] corner" and performing evasive maneuvers to avoid contact because the truck was "coming at [him]," again, as if it were aimed directly at him.

Whitehead's account differs significantly. She explained that she and Settle did not immediately recognize Hart and Collier as officers when they entered the backyard. She explained that they could not see the officers' uniforms through the darkness, only their flashlights. Further, she contends the officers did not verbally identify themselves as law enforcement when they approached the truck and attempted to open its doors. It was not until the officers got closer that Settle and Whitehead could make out the deputies' uniforms. Upon learning that the two unidentified men were officers and being told to unlock the door, Whitehead complied with the officers' commands. However, instead of opening the doors, Collier attempted to break the window with his baton.

Whitehead stated that Settle started the truck after Collier threatened to break the driver's side window. However, she testified that the truck "never moved an inch" after Settle started it. In fact, she maintained that the deputies shot Settle at "almost the exact time" that he started the truck. She said that she knows this because she did not hear the gunshots over the truck's loud ignition. She noted that it was only clear that Collier had fired his

weapon because her leg was burning from the gunpowder and she heard Settle screaming, "Oh my God. Oh, my God."

No one disputes that Collier opened the driver's side door and rendered aid to Settle while Hart removed Whitehead and placed her in the back of his patrol car.

In the aftermath of the shooting, the Plaintiff presented expert testimony from Kelly Timms, a forensics services expert, that Collier was not directly in front of the truck at the time of the shooting. Instead, according to Timms, Collier was in front of the truck's A-line, meaning the "area that most people think of as the [sic] edge of their door. . . [or] the supportive pillar that holds [the] windshield in place." In sum, the parties could not agree on: (1) whether the officers identified themselves; (2) whether Settle started the truck and started to drive it; and (3) whether Collier was in front of the truck and, thus, in danger of being struck.

## B. Material Factual Disputes Regarding Need for Excessive Force Foreclose Summary Judgment

The district court determined that "a reasonable jury could find that [Collier] did not have probable cause to believe that Mr. Settle posed a threat of serious physical harm," and denied Collier qualified immunity. In making that determination, the court pointed to two significant factual disputes: (1) Collier's physical position at the time of the shooting; and (2) the truck's alleged movement. Our jurisprudence, and the longstanding understanding regarding the important role of juries, requires this Court to affirm

the district court's decision and remand the case for further pro-
ceedings.

Of course, many appeals of summary judgment orders raise
questions of both law and fact. They do so because the district
court must conduct a two-step factual and legal inquiry. *See Koch
v. Rugg*, 221 F.3d 1283, 1295 (11th Cir. 2000). The first step defines
the movant's conduct based on the record, taking all inferences in
favor of the nonmovant. *Id.* The second step analyzes whether a
reasonable official would or should have known that the movant's
actions violated clearly established laws. *Id.* at 1294-95.

Here, the only true issues on appeal are factual disputes,
which are defined at the first step. At the district court, Collier ar-
gued that his use of deadly force was reasonable at the time that he
discharged his weapon because Settle refused to exit his truck, put
his keys in the ignition, and placed his hand on the gear. He ex-
plained that "whether the vehicle was moving or not [did] not cre-
ate a disputed issue of material fact." The district court disagreed.
It explained that the inconsistencies regarding if and how the truck
moved were a credibility issue that was improper for summary
judgment. In other words, the district court explained that the
truck's movement, whether forward, backward, or not at all, was
a factual dispute, not a legal dispute.

Collier also argued that his use of force was reasonable be-
cause he was trapped**.** Again, the district court found this was a
material factual dispute. It explained that a juror could rely on Set-
tle's expert to find that Collier was standing "closer to the end of

the porch" rather than entrapped between the house and truck. Accordingly, the court explained that "a reasonable jury could find that the truck did not pose a [reasonable] risk to the defendant" at the time of the shooting. While Collier says that he reasonably feared for his life because he was trapped, his alleged entrapment and subsequent fear are open to a jury's ultimate determination. In short, the court recognized that a reasonable jury could interpret the events on the night of the shooting differently. More importantly, this discrepancy about what the evidence could prove at trial was the basis on which the district court made its decision.

The determination of these factual disputes ultimately factors into our analysis of the legal dispute in this case—whether Collier's use of deadly force was reasonable because he reasonably believed that Settle was using or threatened to use his vehicle as a deadly weapon. *See Singletary v. Vargas*, 804 F.3d 1174, 1181-82 (11th Cir. 2015). Indeed, to reach a legal determination, courts must "slosh [their] way through the fact bound morass of reasonableness." *Morton v. Kirkwood*, 707 F.3d 1276, 1281 (11th Cir. 2023) (quoting *Scott v. Harris*, 550 U.S. 372, 383 (2007)). Our precedent is instructive regarding what constitutes an immediate threat to law enforcement, and what level of force is reasonable.

In *Underwood v. City of Bessemer*, we held that officers did not have probable cause to think a suspect would use his car as a weapon. 11 F.4th 1317, 1329-31 (11th Cir. 2021). There, the suspect was not driving aggressively as if he would harm the officer. *Id.* at 1330. To the contrary, he was inching forward "so slowly

that it looked like he would stop." *Id.*  Just like this case, the car was reportedly about eight feet away from the officer.  *Id.*  The Court ultimately concluded that, accepting those facts as true, a reasonable jury could find that Underwood did not pose a threat to the officer's safety.[1]  *Id.* at 1330-31.

Similarly, in *Morton v. Kirkwood*, we held that an officer lacked probable cause to believe that a suspect posed an immediate threat of harm when the suspect was "an unarmed man in a stationary vehicle."  707 F.3d 1276, 1282 (11th Cir. 2013).  There, officers approached an unarmed man who was sitting in his car at a local park.  *Id.* at 1279.  As the officers approached the man, he began to slowly drive away from them, coasting at a speed of one mile per hour.  *Id.*  At that point, a previously unseen officer stepped in front of the suspect's car and told him to stop the vehicle.  *Id.* at 1279-80.  The suspect then placed his hand on the gear to shift it into park and immediately threw his hands in the air before another officer shot the suspect several times and left him paralyzed.  *Id.*  Ultimately, we concluded that a reasonable officer would have no reason to believe that the suspect's driving put anyone's safety in danger.  *Id.* at 1281-82.

Both *Underwood* and *Morton* underscore the presence and need to resolve factual disputes in the instant case.  In *Underwood*

---

[1] In *Underwood v. City of Bessemer*, we ultimately affirmed the lower court's grant of summary judgment because the officer's alleged violation was not clearly established at the time of the shooting.  11 F.4th 1317, 1332 (11th Cir. 2021).

and *Morton*, we highlighted the suspect's driving in our evaluation of whether an officer reasonably feared for his life at the time of the shooting. Similarly, here, there is a factual dispute about how dangerous Settle's driving was at the time of the shooting. As highlighted above, Whitehead claimed that the truck never moved, while Collier claimed that the truck moved backwards and then possibly forward. Each varying factual account carries a different inference that weighs into the reasonableness of Collier's actions. Because these factual disputes exist about the direction of the truck's movement, or if the truck moved at all, then this case is appropriate for a jury, not a panel of judges.

Ultimately, this appeal does not present questions of law that are applied to undisputed facts. Even Collier concedes that he could not have reasonably used deadly force had Settle been retreating from the scene. So, this dispute comes down to Collier's position at the time of the shooting as well as how and if the truck moved. As the district court explained, these are both factual disputes appropriate for a jury.

## C. Collier is not Entitled to Summary Judgment under Florida's "Self-Defense" Immunity Provision

Florida law allows officers to assert immunity if their actions constitute "self-defense" against a person who uses or threatens to use force, thus endangering the officer's safety. Fla. Stat. § 776.032(1). In short, an individual may use deadly force when he or she believes it is necessary to prevent death or substantial harm to that person or another. *Id.* As the majority notes, we have

previously mirrored our analysis of both Florida's immunity stat-ute and excessive force claims. *See Penley v. Eslinger*, 605 F.3d 843, 855-56 (11th Cir. 2010). Therefore, the factual disputes regarding Collier's use of excessive deadly force also prevent his entitlement to immunity under Section 776.032(1).

### D. Conclusion

For the reasons stated, the district court's denial of Collier's motion for summary judgment should be affirmed. I respectfully dissent.